673 So.2d 585 (1996)
Earl Garland PITRE, Jr., et al.
v.
LOUISIANA TECH UNIVERSITY, et al.
Nos. 95-C-1466, 95-C-1487.
Supreme Court of Louisiana.
May 10, 1996.
Rehearing Denied June 28, 1996.
*586 William Craig Henry, Hudson, Potts & Berstein, Richard P. Ieyoub, Attorney General, for Applicant in No. 95-C-1487.
Mack E. Barham, Robert Elton Arceneaux, Gail N. Wise, Barham & Arceneaux, Gregory P. Massey, Jones, Tete, Nolen, Hanchey, Swift & Spears, for Respondent in No. 95-C-1487.
VICTORY, Justice.
This personal injury case based upon alleged negligence arises out of a sledding accident that occurred on the campus of Louisiana Tech University ("Tech") during a rare winter ice and snow storm. The plaintiff, Earl Garland Pitre, Jr., sustained serious spinal injuries and paralysis when the plastic garbage can lid that he was sledding upon collided with the concrete base of a light pole located in a campus parking lot. We granted writs to examine whether Tech had a duty to warn of the associated risks and/or to protect against injury. Under the circumstances, we find that Tech had no duty since the light pole was obvious and apparent and the risks of colliding with it while sledding are known to everyone.

FACTS
In early January of 1988 a winter storm was forecast for northeast Louisiana. In anticipation of the storm, the Housing Department at Tech distributed the following bulletin to all of its dormitory residents[1]:

WINTER STORMS AND LOUISIANA TECH
The Housing Office would like to pass on to each resident some helpful information all students should find beneficial during winter storm conditions on campus.
We encourage all students to dress warmly when ice or snow is on the ground. We discourage hypothermia, frostbite, etc., all realities during winter storms, but not pleasant realities.
We encourage snowmen, sledding, etc., in proper areas and using good judgement. We discourage sledding down the hills along Tech Drive into the path of oncoming carsnot good judgement nor is being dragged behind a moving vehicle considered using good judgement. Fifteen reported personal injuries were associated with such behavior during the last snow.
We encourage students to get outdoors and enjoy these rare occasions on Tech Campus when everything is blanketed in white. We discourage rowdy and disruptive behavior such as throwing snow/ice balls at passing cars and dorm windows. We had numerous broken car windshields and residence hall windows during our last snowdamages which cost all students.
We encourage groups of students or even entire halls to walk around the campus and surrounding area to view the beauty and spectacle. We discourage students driving during this time. Our accident rate on campus was up several hundred percent during our last snow.
We encourage students to be particularly aware of the special conditions existing during winter stormse.g., hazardous driving conditions; certain streets and roads closed due to icy conditions; and ice on steps and sidewalks making footing precarious. We discourage any and all behavior unbecoming of a college student

*587 In addition we encourage students who must drive or walk during winter storm conditions to note the following tips:

How to Go in Snow
SkidsTake your foot off the gas; do not brake. For rear-wheel skids, turn the steering wheel in the same direction as the skid. For front-wheel skids, do not turn the steering wheel until traction is regained and you regain control.
Stopping SuddenlySlow gradually by pumping the brakes several times; do not brake sharply.
Stuck in SnowClear snow from around all tires and find something to help traction. It's good to carry traction mats or some wire mesh for this purpose. Or you can use dry sand, or ashes.
Icy HillsGoing up: maintain a steady speed. If wheels begin to spin, ease up on the gas pedal, then reaccelerate slowly. Going down: brake gently to reduce speed.
Using Snow Tires and ChainsKeep snow tires inflated to the recommended maximum. For best results, place snow tires or chains on all four wheels.
When WalkingUse warm shoes or boots which repel water and have good grips/ soles. (Underline in original. Bold added.)
As predicted, a rare winter storm did occur on January 6-7, 1988. The entire Tech campus was covered with ice and snow, and classes scheduled for January 7 were canceled. Because of the conditions, many of the 3,406 students residing in Tech dormitories were unable to leave the campus. A number of these students took advantage of the unique opportunity by engaging in sledding, an infrequent activity on Tech's campus and for most Louisiana residents.
Among those was 20-year-old Earl Garland Pitre, Jr. ("Pitre"), a native of Lake Charles, Louisiana, who was in his third year at Tech. On the evening of January 7, 1988, Pitre walked from his room at Neilson Dormitory through a parking lot between the Thomas Assembly Center and the Joseph Aillet Football Stadium to attend a Tech basketball game at the Assembly Center. When the game ended at approximately 9:00 p.m., Pitre walked back through the same parking lot to his room and made a few telephone calls. After visiting with fellow dormitory resident, Todd Efird, the two walked back to the Assembly Center where they gathered to sled with friends, Paul McCarver, Mark White and David White.
The Assembly Center is located on a hill near the football stadium. At the east and northeast entrances of the Assembly Center, the hill (approximately 15 feet high and 85 feet long from its crest to its base) slopes into the stadium parking lot.[2] At the other end of the parking lot is the football stadium, which is surrounded by a road and is approximately 143 feet from the base of the hill. Several light poles, spaced about 150 feet apart, are located throughout the parking lot. The poles are secured with concrete bases approximately 1 foot 10 inches in height and 2 feet in diameter.
When Pitre arrived at approximately 11:00 p.m., there were several students sledding down the hill into the stadium parking lot using various devices, including, cardboard, a toilet seat, plastic advertising signs, food trays, baking trays, part of a rocking chair, and homemade sleds. Initially, Pitre made three trips down the hill on a piece of cardboard. He then began sledding on a large plastic garbage can lid approximately five to six feet wide, which had been brought from off-campus. The lid was more desirable because it held up to four riders, and went faster and farther than any of the other devices. On several occasions the lid traveled as far as the stadium, over 224 feet.
This tragic accident occurred during Pitre's eighth trip down the hill on the lid. Pitre mounted the lid with three other individuals, Allyson Hines, Johanna Broussard and John Dumond. These riders (including Pitre) described their assumed positions as lying side-by-side on their backs with their feet facing uphill and their heads facing *588 downhill.[3] The lid was then pushed from the top of the hill by Paul McCarver. As it proceeded down the hill into the football stadium parking lot, the lid collided with the concrete base of one of the light poles. As a result, Pitre sustained head and back injuries resulting in permanent paralysis from the mid-chest down.

PROCEDURAL HISTORY
On December 30, 1988, Pitre and his parents, Earl G. Pitre, Sr. and Joan Pitre, filed suit against Tech and the State of Louisiana. They alleged that Tech was negligent in the following respects: (1) encouraging students, by way of the Winter Storms Bulletin, to engage in sledding activities in areas which Tech knew or should have known were hazardous; (2) failing to erect cushions around solid objects to prevent sledding injuries; (3) failing to warn students of the hazards which might be encountered in the area in which sledding took place; and (4) failing to prohibit sledding in the area where the accident occurred.
On November 28, 1990, the defendants moved for summary judgment claiming that Tech had no duty to Pitre. On December 5, 1990, the plaintiffs also moved for summary judgment. The trial court granted the defendants' motion, finding that the danger of striking a fixed object while sledding was obvious and apparent. Accordingly, the trial court held that Tech had no duty to warn, that the Winter Storms Bulletin did not create an affirmative duty, and that there was no duty to place cushions around the light poles.
On appeal, a narrow majority of the Louisiana Second Circuit Court of Appeal reversed and remanded. Pitre v. Louisiana Tech University, 596 So.2d 1324 (La.App.2d Cir.1991).[4] According to the court of appeal, Tech's general duty as a landowner, to discover unreasonably dangerous conditions or uses of its premises and to either correct or warn of their existence, was heightened by its relationship with Pitre as a dormitory resident and student. Relying upon Fox v. Board of Supervisors of Louisiana State University, 576 So.2d 978 (La.1991), the court of appeal acknowledged that adult students must be held responsible for their own conduct, and that Tech could not practically control all on-campus activities. However, the court of appeal concluded that Tech could not "abandon all efforts to insure the physical safety of its students" because "parents, students and the general community have some expectations that reasonable care will be exercised to protect students from foreseeable harm." Citing Socorro v. City of New Orleans, 579 So.2d 931 (La.1991), the court of appeal also reasoned that it was not proper to focus solely upon Pitre's knowledge and conduct when examining whether Tech had a duty.
The court of appeal found that Tech knew that the students would be using this hill for sledding; that Tech was aware, through the campus Police Department which had stopped sledding on campus hills, of the specific danger presented by the light poles; and that through the Winter Storms Bulletin, Tech "encouraged" Pitre, a 20-year-old student without prior sledding experience, to undertake the risk. According to the court of appeal, these circumstances created "an illusion of safety" which removed or lessened Pitre's reality of the actual danger, and gave Tech the duty to protect or warn against this unreasonably dangerous activity.[5]
The defendants requested review of the court of appeal's decision, which this Court denied, stating: "Review of the court of appeal's *589 denial of defendant's motion for summary judgment is not warranted at this state of the proceeding." Pitre v. Louisiana Tech University, 604 So.2d 998 (La.1992).
After trial on the merits, the trial court issued a lengthy opinion wherein it again found that Tech owed no duty to Pitre. On appeal, the trial court's decision was reversed. Pitre v. Louisiana Tech University, 26388 (La.App.2d Cir. 5/10/95); 655 So.2d 659 (Hightower, J., dissenting). The court of appeal refused to address the duty issue, finding that its prior decision was law-of-the-case and that the trial court legally erred by revisiting the duty issue on remand. The court of appeal found that the duty issue became final when this Court denied writs. Upon considering the elements of breach and causation, the court of appeal concluded that Pitre was 75% at fault in causing the accident. Pitre was awarded the following damages, subject to reduction: $2,500,000.00 in general damages; $128,770.87 in past medical expenses; and $1,163,831.00 in future medical expenses. Pitre's parents were each awarded $35,000.00 (subject to reduction) for loss of consortium.
We granted the plaintiffs' and the defendants' respective applications for writs of certiorari. Under the facts presented, we find that sledding is not inherently dangerous, the light pole was patently obvious and apparent to all, and that the hazards of colliding with fixed objects while sledding are well-known. As such, the light pole did not present an unreasonably dangerous condition, and Tech had no duty to warn of the condition or protect against the obvious risks associated with sledding down a hill in the direction of a light pole.[6]

LAW OF THE CASE
Preliminarily, we observe that the principle of law-of-the-case has no bearing upon our decision today. Under this doctrine, courts of appeal generally refuse to reconsider their own rulings of law on a subsequent appeal in the same case. However, the law-of-the-case principle is not applied to prevent a higher court from examining the correctness of the ruling of an intermediate appellate court. Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 256 So.2d 105, 107 (1971).
This Court has not previously decided any of the issues presented, including whether Tech owed a duty to Pitre. The Court's denial of the defendants' request for review of the court of appeal's reversal of summary judgment has no precedential value, and should in no way be construed as an adoption of the court of appeal's ruling or reasoning. St. Tammany Manor, Inc. v. Spartan Building Corp., 509 So.2d 424 (La.1987).

NEGLIGENCE & DUTY-RISK ANALYSIS
Tech's potential liability is predicated upon the concepts of fault and negligence under La.Civ.Code arts. 2315 and 2316, which make all persons responsible for damages caused by their "negligence." In order to determine whether liability exists under the facts of a particular case, this Court has adopted a duty-risk analysis.[7] This analysis takes into account the conduct of each individual party and the peculiar circumstances of each case. Socorro, 579 So.2d at 938. The relevant inquiries are:
(1) Was the conduct of which the plaintiff complains a cause-in-fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Whether the requisite duties were breached?

*590 (4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
(5) Were actual damages sustained?
Socorro, 579 So.2d at 938-39 (citations omitted).
If the plaintiff fails to satisfy one of the elements of duty-risk, the defendant is not liable. Because we find that Tech had no duty under the facts of this case, we pretermit discussion and consideration of the remaining elements.

DUTY
A landowner owes a plaintiff a duty to discover any unreasonably dangerous condition and to either correct the condition or warn of its existence. Socorro, 579 So.2d at 939, citing Shelton v. Aetna Casualty & Surety Company, 334 So.2d 406, 410 (La. 1976). It is the court's obligation to decide which risks are unreasonable, based upon the facts and circumstances of each case. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1371 (La.1984). Whether a particular risk is unreasonable is a difficult question which requires a balance of the intended benefit of the thing with its potential for harm and the cost of prevention. Socorro, 579 So.2d at 939, citing Landry v. State, 495 So.2d 1284, 1288 (La.1986); Entrevia v. Hood, 427 So.2d 1146 (La.1983).
In making this determination in negligence actions, the "obviousness" and "apparentness" of the complained of condition have historically been taken into consideration.[8] In Shelton, supra, the plaintiff sought damages for injuries she sustained after slipping in the yard of her son's property. Pursuant to a usufruct granted to them by their son, the plaintiff and her husband lived in an apartment adjacent to the son's home. On the morning of the accident the plaintiff's son washed a garage on the property, using a mixture of lime, baking soda and water. Later that evening, the plaintiff slipped upon a small residual patch of the mixture as she was walking from the apartment to a nearby swing. She sued her son's homeowner's liability insurer, claiming negligence. This Court found that no duty existed because the residual mixture did not present an unreasonable risk of harm. In so finding, the Court observed:
[T]he proper test to be applied in determining a landowner's liability under articles 2315 and 2316 of the Civil Code is "`whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others,' ".... The duty of a landowner is not to insure against the possibility of an accident on his premises, but rather to act reasonably in view of the probability of injury to others. Thus the landowner is not liable for an injury resulting from a condition which should have been observed by an individual in the exercise of reasonable care or which was as obvious to a visitor as to the landowner.
Shelton, 334 So.2d at 410 (citations omitted).
This test was reaffirmed in Murray v. Ramada Inns, Inc., 521 So.2d 1123 (La. 1988). There, the decedent sustained fatal injuries after striking his head upon the bottom of a Ramada Inn swimming pool while diving. His wife and children instituted a wrongful death action against the companies that franchised, owned and operated the motel, and their respective liability insurers, alleging liability based on negligence and strict liability. Upon certification from the U.S. Fifth Circuit Court of Appeal, this Court held that the absolute defenses of assumption of the risk and contributory negligence were no longer viable as they had been subsumed by comparative fault principles.
The defendants raised a subsidiary argument independent of the defenses of assumption of the risk and contributory negligence. They contended that they were not liable to the plaintiffs because they had no duty to protect the decedent from a danger of which he had knowledge (i.e., diving into shallow water). The Court rejected the defendants' argument finding:

*591 If accepted, defendants' argument would inject the assumption of risk doctrine into duty/risk analysis "through the back door." By that, we mean that the argument attempts to define the defendant's initial duty in terms of the plaintiff's actual knowledge, and thereby seeks to achieve the same result which would be reached if assumption of risk were retained as a defense, i.e., a total bar to the plaintiff's recovery.
A defendant's duty should not turn on a particular plaintiff's state of mind, but instead should be determined by the standard of care which the defendant owes to all potential plaintiffs. See Robertson, supra, 44 La.L.Rev. at 1378.
Murray, 521 So.2d at 1136.
Continuing, the Court differentiated between the defendants' argument regarding the plaintiff's subjective knowledge of the danger, and the potential argument that a duty is not owed when the complained of condition is obvious and apparent to all:
Again, this is not to say that a duty is owed or breached in all situations that involve injury. We have held, for example, that the duty which a landowner owes to persons entering his property is governed by a standard of reasonableness, and that a potentially dangerous condition that should be obvious to all comers is not, in all instances, unreasonably dangerous. See, e.g., Shelton v. Aetna Casualty & Surety Co., 334 So.2d 406, 410-11 (La. 1976). However, the key to a finding of no liability in such cases is not the plaintiff's subjective awareness of the risk, but the determination that the defendant did not act unreasonably vis-a-vis the plaintiff, or injure the plaintiff through the instrumentality of an unreasonably dangerous thing in his custody. The determination of what the plaintiff knew regarding the risk of injury is made after fault on the part of the defendant has been established, and is governed by the comparative fault principles ennunciated [sic] in La.Civ.Code art. 2323. (Italics in original.)
Murray, 521 So.2d at 1136.
Thus, the obviousness and apparentness of a potentially dangerous condition are relevant factors to be considered under the duty-risk analysis. If the facts of a particular case show that the complained of condition should be obvious to all, the condition may not be unreasonably dangerous and the defendant may owe no duty to the plaintiff. Socorro, 579 So.2d at 942, citing Murray, 521 So.2d at 1137.

APPLICATION OF THE LAW TO THE FACTS

Utility of the Light Pole
We begin our analysis by examining the utility of the light pole. Clearly, the poles were erected to support the lights that illuminated the stadium parking lot. By necessity, the poles were systematically spaced throughout the parking lot to provide uniform lighting throughout. The affidavit of Bill Cox, the Director of Athletic Facilities, indicates that the parking lot lights were automatically programmed to turn on every evening at 7:00 p.m. and off every morning at 1:00 a.m. For evident safety reasons, providing adequate lighting for users of the parking lot, including both pedestrians and motorists, is of great interest to Tech and the public at large. As such, we find that the light poles serve an important public interest and are of great utility.

Likelihood and Magnitude of Harm: Obviousness and Apparentness
With this in mind, we next study the likelihood and magnitude of the harm. It is here that the obviousness and apparentness of the complained of condition should be considered, since it is improbable that a potentially dangerous condition which is observable to all will cause injuries to an individual who exercises reasonable care.
The trial court decided on two separate occasions (the motion for summary judgment and the trial on the merits) that the area was well-lit on the evening of the accident, and that the light pole was "readily observable" or "clearly visible" by those engaged in sledding that night. After examining the evidence, we conclude that the trial court was correct in this determination.
*592 The depositions of numerous individuals sledding on the Assembly Center hill when the accident occurred were introduced into evidence. Pitre's three fellow riders overwhelmingly agreed that the parking lot was well-lit on the evening of the accident, and even acknowledged that sledders had hit fixed objects during prior trips down the hill. Allyson Hines testified that all of the lights in the parking lot were lit on the evening of the accident, including the light on the pole that Pitre hit. She remembered seeing the lid travel as far as the stadium. Johanna Broussard recalled that the hill was lit well enough to see from the top of the hill to the stadium, and that all of the light poles in the parking lot could be seen from the hill. She stated that at least twice she observed riders on the lid hit the stadium and/or the stadium fence. Similarly, John Dumond recollected that the light on the pole that Pitre hit was lit, and that you could see the light pole from the top of the hill. He even remembered seeing others slide past the light poles while riding on the lid.
The testimony of the group of friends that Pitre was sledding with was consistent with that of those riding on the sled with Pitre when the accident happened. Paul McCarver, from Arkansas, stated that the sky was clear on the night of the accident, and that there was plenty of light on the hill. He recalled sledding past the light poles all of the way to the stadium. He also stated that everyone sledding on the hill should have been aware of the light poles, despite the lack of any prior sledding experience. Mark White, also of Arkansas, testified that there was plenty of light on the parking lot, and that you could see the light poles. Mark's brother, David, described the lighting as "pretty bright," and recalled being able to see the pole that Pitre hit. He also stated that it occurred to him that he could injure himself by hitting one of the light poles because he had previously struck the stadium and a pole near the stadium.
Another group of sledders that witnessed the accident also uniformly testified that the light pole was observable. Arla Caldwell stated that the area was well-lit, and that she could see the pole that Pitre struck from where she was standing on the top of the hill. She recalled that on some occasions sledders slid within three to six feet of the pole that Pitre hit. She also stated that sledders had traveled as far as the fence surrounding the stadium. Cedric Champeaux concurred. He testified that the parking lot was well-lit, and remembered that the parking lot lights were on. He noticed all of the light poles in the area of the parking lot where his group was sledding, including the pole that Pitre hit. He specifically stated that he was "watching" these light poles because he was concerned about colliding with them. Renee Goldman remembered that she considered sledding on the lid to be dangerous because it slid as far as the stadium fence. Renee's husband, James, also recognized the danger. He stated that he saw the lid hit the stadium fence a couple of times. He also testified that he perceived the light poles as being more of a danger because he saw sledders on the lid come within two feet of hitting them on a couple of occasions.
As further evidence of the lighting conditions, we observe that at least two persons on the hill that evening stated that they attempted to warn Pitre and the other three sledders of the impending collision as the lid approached the base of the pole. Paul McCarver stated that immediately after he pushed the lid from the top of the hill he could tell that it was not following the same path that it had on prior occasions. He testified that he started "jumping and hollering, trying to warn them that it was going toward the pole." Arla Caldwell, who was also standing on the hill, recalled that approximately two-thirds of the way down the hill it became obvious that the lid was sliding towards the pole, and "everyone began to yell and say, `Jump,' you know, `Get off.' These attempts to warn show that the pole must have been visible from the hill.
This evidence overwhelmingly demonstrates that the parking lot was well-lit, and as the trial court found, that the light pole should have been readily apparent and observable to anyone sledding on the Assembly Center hill on the evening of the accident. Thus, the likelihood of harm was slim to anyone exercising reasonable care.
*593 In brief, the plaintiffs claim that this case is similar to Socorro, supra, wherein this Court held that the defendant had a duty to warn the plaintiff not to dive into a particular area of Lake Ponchartrain because rip rap was shallowly located under the water. The plaintiffs argue that the danger there was no less obvious than here. We disagree. The dangerous condition in Socorro, the rip rap, was concealed by water and was not obvious and apparent to all. Here, the dangerous condition was in plain view and should have been seen by all.

Cost to Prevent Harm
The plaintiffs argue that there were numerous methods that Tech could have employed to prevent this accident, including placing warning signs on the hill, posting an officer on the hill and erecting barriers around the light poles (e.g., bales of hay or cushions).
While these proposed means for preventing sledding and protecting against the accident are feasible, they were not necessary in light of the low likelihood of injury if sledders used good judgment and exercised reasonable care. Again, the potential for injury by sledding into a fixed object is obvious and apparent. The most effective means of preventing this accident rested with Pitre. To require Tech to take the proposed measures to protect from this obvious and apparent danger would place a huge burden upon the University by requiring it to warn and/or protect against all risks (e.g., buildings, signs, fences, trees, etc.) associated with sledding on campus. The cost to prevent potential harm by posting signs, officers and/or barriers at every object on campus that one might slide into would be enormous.

Nature of Activity
Finally, we end our inquiry by examining the activity, particularly its social utility and whether it is dangerous by nature. The recreational activity of sledding, while fun, is of minimal social utility. Although it is gratifying to participants, it is voluntary and does not generally benefit society in any substantial way.
Furthermore, the record supports the trial court's conclusion that sledding is not dangerous by nature. Dr. David Nichols, the defendant's expert in campus public safety and law enforcement, compared sledding to skateboarding or biking. In each of these activities it is the manner in which the activity is undertaken that determines the degree of dangerousness.
It is common knowledge that one must be able to steer to avoid colliding with fixed objects while sledding. Despite his familiarity with the campus and the parking lot, Pitre chose to sled, on his back, head first, down a hill on a device over which he had no control. While Pitre claims not to have perceived the danger, if true, he clearly was unreasonable in not doing so and taking simple measures, such as sledding feet first and on a sled not so slippery, to protect himself.
In sum, the light pole is of great social utility, as it serves important safety interests by providing lighting to pedestrians and users of the parking lot. Furthermore, the likelihood of the harm was minimal since the light pole was obvious and apparent to those sledding on the hill that evening, and the associated risks of colliding with it while sledding were well-known.
The cost of prevention would have been great to Tech. The obviousness and apparentness of the condition made it easy for Pitre to avoid the accident simply by exercising reasonable care to protect himself.
For these reasons, we conclude that the trial court was correct in finding that the condition was not unreasonably dangerous and that Tech had no duty to Pitre.

OTHER ARGUMENTS ADVANCED BY PLAINTIFFS
The plaintiffs argue that special circumstances in this case justify imposing a duty upon Tech. They contend that Tech acknowledged the hazards of sledding through an unwritten no-sledding policy which the Tech Police Department adhered to and implemented by stopping sledding on numerous campus hills, including the Assembly Center hill where Pitre was injured. Despite this acknowledgment, Tech distributed the Winter Storms Bulletin which, according to plaintiffs, encouraged students to sled in every *594 area of the campus (safe or unsafe), except around Tech Drive. Finally, the plaintiffs argue that the "no-sledding" policy and the Winter Storms Bulletin, combined with Pitre's status as a student and dormitory resident, made it more likely that Pitre would be injured, thereby imposing upon Tech the duty to warn or prevent the accident.

Police Policy
It is undisputed that some Tech Police Officers stopped some sledding on campus. The plaintiffs assert that this Departmental practice established a University-wide policy, which the administration of Tech was obligated to monitor and regulate, and that this policy constituted a recognition by Tech that sledding was hazardous.
The trial court held that Tech did not have a departmental policy regarding sledding in general, but would stop it on a case-by-case basis depending on the individual officer and the situation. The record supports this finding. Glenn Theis, the acting Director of the Housing Department at the time of the accident, stated that there was no University policy regarding sledding when the accident occurred. This was confirmed by Jean Hall, who was appointed to be the Vice-President of Student Affairs days after the accident. Additionally, Dr. David Nichols, the defendants' expert in campus public safety and law enforcement, testified that to establish a University policy, certain procedural steps must be taken, such as promulgation from the administration, approval, incorporation into a written reference book and dissemination.
Furthermore, the deposition testimony of the majority of the officers which was introduced at trial also supports the trial court's conclusion. Chief Steven Quinnelly, a Detective at the time of the accident, stated that the object was to stop unsafe activity, including sledding into dangerous areas like Tech Drive or parking lots. Sergeant Bobbie Merritt agreed. He testified that, "If there was ice on there [the Thomas Assembly Center parking lot] and they were sliding down and it looked like it was dangerous, which the majority of the time it was because there were people down their driving in the lots and all, too, then we would stop them," and "The only places I ever stopped anybody [from sledding] is when I felt it was unsafe for them and I would say something to them." In similar fashion, Sergeant John R. Bennett, the shift supervisor on the evening of the accident and one of the officers dispatched to the scene, stated that officers were not directed by their superiors to stop sledding in certain areas. Rather, they were to use their discretion if they thought the sledders might hurt themselves. Sergeant Debra White concurred. She testified that officers were to stop potentially dangerous sledding, such as into streets.
Therefore, the Department policy did not constitute an acknowledgment by Tech that sledding is an inherently dangerous activity. Rather, by its application to dangerous sledding only, it bolsters our prior conclusion that an ordinarily harmless activity, such as sledding, biking, skateboarding, etc., may become dangerous if undertaken in an unsafe manner.
The plaintiffs contend that Tech is liable because it knew of the danger of sledding on the Assembly Center hill. As support, they point to the testimony of several of the officers who stated that they stopped sledding on the Assembly Center hill because they considered it to be dangerous. Again, this does not constitute an acknowledgment that sledding is inherently dangerous. The perceived danger was not the sledding itself, rather, the officers feared injury due to the manner in which the sledding was being conducted, including the fear that students were not taking the proper precautions to prevent known risks like striking fixed objects which were in plain view. There is no evidence to suggest that Tech had any more knowledge of the danger than Pitre or anyone else who chose to sled down the hill at the Assembly Center.

Winter Storms Bulletin
With regard to the Winter Storms Bulletin, we agree with the trial court's conclusion that, "[i]t was not a blanket sanction of all sledding in any area, and under any circumstances." The information and warnings contained in the Winter Storms Bulletin that was distributed by Tech's Housing Department *595 were consistent with the approach taken by the Police Department. The language therein specifically provided that the University encouraged sledding, but warned of sledding only "in proper areas and using good judgment." By definition, this meant that students may sled, but that they should exercise care when doing so.
In fact, the Winter Storms Bulletin even gave students some direction in this area, by providing: "We discourage sledding down the hills along Tech Drive into the path of oncoming carsnot good judgementnor is being dragged behind a moving vehicle considered using good judgement." By its terms, this portion of the Winter Storms Bulletin was intended by the University to provide examples or illustrations of what was not considered to be good judgment.
The plaintiffs claim that Pitre relied upon the Winter Storms Bulletin in his decision to sled, and that he construed it as University approval of sledding on any hill except along Tech Drive. Yet the record supports the trial court's finding that, "the winter storms bulletin was not the impetus which began this particular activity." Pitre alone testified that the Winter Storms Bulletin prompted him to go sledding that night.[9] None of the other students stated that they relied upon the Winter Storms Bulletin. In any event, even if Tech had sanctioned sledding on the Assembly Center hill and Pitre relied upon it, the obligation to use good judgment remained with him. This included the responsibility of preventing injury by observing and avoiding obvious fixed obstacles, such as the light pole, and by not riding backwards, upside-down, on a non-steerable garbage can lid in the direction of the pole.
The plaintiffs also claim that Tech assumed an affirmative duty to warn or prevent this accident by issuing the Winter Storms Bulletin and because its police officers undertook the responsibility of stopping sledding. As support, they rely upon Harris, supra, which involved a negligence action against Pizza Hut of Louisiana, Inc., after one patron was injured and one was killed in an armed robbery. The Court found that the defendant assumed a duty to protect its customers from harm by hiring a security guard. In so finding, the Court placed emphasis on the fact that the restaurant had been robbed repeatedly and that the security guard negligently discharged his duties.
This case is distinguishable from Harris because the risk here was obvious to all and Pitre was able to protect himself simply by exercising good judgment as he was sledding down the hill. If we were to adopt the plaintiffs' argument, Tech and many other institutions would be forced to shoulder an insurmountable burden. Consider the remainder of the Winter Storms Bulletin, which warns of well-known dangers associated with cold weather, such as frostbite, hypothermia, walking on icy sidewalks and driving on icy roads. Under the plaintiffs' theory, Tech assumed a duty to protect its students from all of these obvious and apparent risks. Yet we conclude that every college student should know of such dangers, and should take the simple measures necessary to protect himself.

Special Relationship
Finally, the plaintiffs argue that Tech had a duty to Pitre because he was a student and resident at the university. In Fox, supra, this Court acknowledged that universities no longer stand in loco parentis to their students, noting that attempts to foster the educational process, and the growth and maturation of students had relieved universities of many of their protective duties. Under the modern university-student relationship, "the college student is considered an adult capable of protecting his or her own interests; students today demand and receive increased autonomy and decreased regulation on and off of campus." Fox, 576 So.2d at 982, citing University of Denver v. Whitlock, 744 P.2d 54, 59-60 (Colo.1987).
When the accident occurred Pitre was an adult. We agree with the trial court's finding that, "[t]here are certain activities which the adult of average intelligence knows may be hazardous under certain conditions. Neither the university administration nor the *596 campus police had greater knowledge of the dangers presented by this activity nor of the likelihood of the severity of the harm, than did the students who participated." We find no basis to place a duty upon Tech merely because of its relationship with the injured plaintiff.

CONCLUSION
When deciding whether a condition is unreasonably dangerous, the obviousness or apparentness of the complained of condition is a factor to be considered as part of the likelihood of the harm element. Under the facts of this case, we find that sledding is not inherently dangerous and that the light pole and the danger of sledding down the hill into the pole were obvious and apparent to all on the evening of the accident. Thus, the light pole did not present an unreasonably dangerous condition and Tech had no duty to warn of the apparent danger or take steps to protect against injury. Further, the Tech Police Department's unwritten policy of stopping dangerous sledding, the Housing Department's Winter Storms Bulletin, and the plaintiff's relationship with Tech do not change this conclusion. Since Tech had no duty to Pitre under these facts, the defendants can not be held liable.

DECREE
For the reasons set forth above, the judgment of the court of appeal in favor of plaintiffs, Earl Garland Pitre, Jr., Earl Garland Pitre, Sr., and Joan Pitre, and against Louisiana Tech University and the State of Louisiana, is hereby reversed, and this lawsuit is dismissed at plaintiffs' costs.
REVERSED.
WATSON, J., dissents and assigns reasons.
JOHNSON, J., dissents.
LEMMON, J., concurs and assigns reasons.
KIMBALL, J., concurs for reasons assigned by LEMMON.
LEMMON, Justice, concurring.
In my view, the pivotal issue in the duty-risk analysis in this case is not the existence of a duty, but the breach of duty.
The duty-risk analysis usually focuses on the general duty imposed upon the defendant by statute or rule of law, according to the relationship between the parties and the circumstances of the particular case, and then determines whether there was a breach of that general duty. The statement that "the defendant had no duty," as noted in Professor David W. Robertson et al, Cases and Materials on Torts 161 (1989), should be reserved for those "situations controlled by a rule of law of enough breadth and clarity to permit the trial judge in most cases raising the problem to dismiss the complaint or award summary judgment for defendant on the basis of the rule." Thus, a "no duty" defense generally applies when there is a categorical rule excluding liability as to whole categories of claimants or of claims under any circumstances. In the usual case where the duty owed depends upon the circumstances of the particular case, analysis of the defendant's conduct should be done in terms of "no liability" or "no breach of duty."
Here, the defendant had a duty to act reasonably in view of the foreseeable risks of danger to students resulting from the winter storm. As noted by the majority, the defendant did act reasonably under the circumstances. The defendant warned students by means of the Winter Storms Bulletin that sledding, while fun, can be dangerous unless limited to proper areas and accompanied by the use of good judgment. The bulletin provided several examples of bad judgment that had led to injuries in the past. Furthermore, the campus police halted any unsafe sledding and other dangerous activities that the officers observed. Because the particular risk in this case of colliding with the light poles was obvious and apparent to everyone, including the plaintiff and his companions, no warning was required, and the defendant did not breach its duty of reasonable care by failing to warn of that particular risk or by failing to erect protective barriers.
*597 WATSON, Justice, dissenting.
The majority opinion ignores the expert testimony of Dr. Dan Corbin that hay bales could have protected the cement light poles from student impact at minimal cost. Dr. Corbin also testified that the Assembly Center hill was the most desirable place for campus sledding. The university could reasonably have anticipated that the sledding it encouraged would take place there. Given that encouragement, a few hay bales would not be an unreasonable burden on Louisiana Tech University.
Pitre was a thoughtful and responsible young person who would not have been sledding if he had perceived the danger. Before this tragedy, a police officer had stopped sledding at the Assembly Center because of the danger from the cement light poles. The university security department was well aware of the danger and should have warned students about the danger of the superficially alluring sledding site.
The Winter Storms Bulletin was an implicit invitation to sled at the Assembly Center. Pitre had read the Bulletin and said it was a factor in his going sledding. If the university had warned of the known danger at the Assembly Center site, he would not have gone there.
The court of appeal correctly held:
Defendants knew that the hill at the Assembly Center was utilized by sledders. They knew that the last snow resulted in fifteen personal injuries associated with student play in the snow and icy conditions. Furthermore, the danger presented by the light poles in the parking lot at the Assembly Center was such that serious injury was likely to occur should a sledder strike one of the posts. As noted above, the burden of prevention was minimal to the university; there were several inexpensive measures that could have been implemented to either warn students of the danger presented or to make the hill safe. The only positive action taken by the university was to place a bulletin on each dorm student's bed encouraging sledding. Defendants breached the duty owed to Earl by failing to correct or warn of the danger presented by the light poles at the bottom of the Assembly Center hill.
The majority opinion conflicts with Socorro v. City of New Orleans, 579 So.2d 931 (La. 1991). Diving into unknown waters is an obvious danger, at least as obvious as the base of this pole. Here, as in Socorro, plaintiff's negligence does not eliminate the university's duty to warn against sledding at this dangerous site. The court of appeal correctly assessed fault at 75% to Pitre and 25% to Louisiana Tech University. Hay bales around the poles would not have been an unreasonable burden for the university and would have prevented this tragic accident.
The majority opinion seeks to renew the doctrines of assumption of the risk and contributory negligence. Even so, the majority is wrong. This writer does not believe for one moment that young Pitre said to himself: "I am going to slide down the hill and take the risk of hitting one of those poles." Simply put, he foolishly ignored the poles and the danger, just as did Tech. Their negligence was properly compared.
I respectfully dissent.
NOTES
[1] Hereinafter referred to as the "Winter Storms Bulletin."
[2] This is the same parking lot which Pitre walked through to get to and from the Assembly Center.
[3] One witness to the accident, Arla Caldwell, described the riders' positions differently. She recalled them sitting one behind the other with each rider straddling the rider in front of him or her. However, her description was consistent with that of the riders as she also recalled that they traveled with their feet facing uphill (i.e., backwards).
[4] Initially, the summary judgment was affirmed by Judges Sexton and Lindsay, with Judge Brown dissenting. On rehearing, it was reversed by Judges Norris, Brown and Stewart, with Judges Sexton and Lindsay dissenting.
[5] In so finding, the court of appeal did not sustain the plaintiffs' motion for summary judgment, but merely reversed the trial court's ruling sustaining the defendants' motion for summary judgment.
[6] This finding renders the plaintiffs' assignments of error relating to comparative fault and damages moot. Our decision also moots the issues raised in the defendants' supplemental brief regarding the revival of La.R.S. 13:5106 and 5112 by the 1995 amendment to La. Const. art. XII, § 10(C). See, 1995 La.Acts Nos. 828 and 1328.
[7] See Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962). See also, Robertson, Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., 34 La.L.Rev. 1 (1973); Crowe, Anatomy of a Tort Greenian, As Interpreted by Crowe Who Has Been Influenced by MaloneA Primer, 22 Loy.L.Rev. 903 (1976).
[8] These considerations are also relevant in products liability actions. La.R.S. 9:2800.57(B). See also Maehler, Note, Glittenberg v. Doughboy Recreational Industries: The "Open and Obvious Danger" Rule, 1993 Det.C.L.Rev. 1357 (Fall, 1993).
[9] This testimony conflicted with that given by Pitre during his deposition, wherein he stated that the Winter Storms Bulletin was not a factor in his decision to sled.