liAMY, Judge.
The plaintiffs, Jerry Burnaman, individually and on behalf of his minor children, and his wife, Jamie Burnaman, filed suit alleging that he was injured while performing farrier services on a horse owned by the defendants, Byron and Maxine Juneau. Following a jury trial, judgment was entered in favor of the defendants. The plaintiffs now appeal. We affirm for the reasons below.
Factual and Procedural Background
The record in this personal injury matter indicates that the plaintiff, Jerry Bhrnaman, *800 worked as a part-time farrier. This suit was filed by Burnaman to recover for injuries allegedly received while performing farrier services on a horse belonging to the defendants, Byron and Maxine Juneau. The plaintiff maintains that the defendants, along with their personal liability insurer, Louisiana Farm Bureau Insurance Company, are liable under both negligence and strict liability theories of recovery. The following testimony was presented at trial.
RBurnaman testified that he had been providing farrier services to the Juneaus for approximately five years at the time of the accident and, during that time, had performed those services approximately once every four to six weeks. He stated that he would usually be accompanied onto the property by Maxine Juneau’s son, Samuel Gas-pard. Burnaman stated that, often, while he worked on one of the- horse’s hooves, Gas-pard would hold the horse’s head and, if Gaspard did not accompany him, he would tie the horse'to the tailgate of his track. Gas-pard confirmed that he often rendered assistance to the plaintiff. Furthermore, Burna-man testified that he had never experienced any trouble with the horses in the years he provided services on the Juneau farm.
Burnaman stated that when he visited the defendants’ farm on February 24,[1] 1995, he did so earlier in the day than usual and, as a result, Gaspard was not home from school and could not assist him. He stated that, when he arrived at the farm, he found the family’s gelding, Banner, in a separate pasture from the Shetland mare, Pumpkin, and her colt. Furthermore, a fourth horse, Money, was in a corral adjacent to the barn. Burnaman indicated that it was not unusual to find the horses separated into different areas.
Burnaman testified that he parked his track near the barn and first worked on Pumpkin, who was pastured in the same area. When he finished tending to her, the plaintiff allowed her to return to her colt. Next, Burnaman retrieved Money from the |8corral, tied him to the tail gate of his track, and performed the necessary services. After finishing with Money, Burnaman returned him to the corral. Finally, Burnaman tended to the gelding, Banner. He stated that he initially couldn’t catch Banner in the back pasture, but eventually coaxed him into the area near his track with a bucket of feed. As with the other horses, Burnaman tied Banner to his truck.
At the time of the alleged incident, Burna-man had completed his work on three of Banner’s hooves and was working on the last rear hoof. He stated the following with regard to his work on the final hoof:
I had the leg stretched out toward the back of the horse, more or less. You’ve got to put the horse’s hoof between your legs and walk backwards toward the rear of the horse. Your back is toward the head of the horse. The horse is more or less facing, you know, opposite from you and had the leg ... the horse’s leg stretched out, had it ... the hoof clenched between my knees and I was trimming it, cutting the sole of the hoof out, and that’s when the incident occurred.
He stated that the accident occurred when Banner jerked his foot forward, throwing him to the ground. Although Burnaman had previously experienced horses pulling their legs forward, he testified that he had never had one react as violently as did Banner in this instance.
When asked if he had been able to determine what caused Banner’s behavior, Burna-man testified that, when he stood up, Pumpkin was standing at Banner’s head and that there was saliva on Banner’s jaw. He said that, upon seeing this, he “knew that the horse had gotten bit on the jaw.” He also testified that Banner continued to try to get away from Pumpkin and that, after he calmed the gelding, he put Pumpkin and her colt into a stall. Burnaman then returned to Banner and completed his work.
LUpon leaving the Juneau farm, Burna-man stopped at the family’s store in order to *801 be paid by Mrs. Juneau. He stated that he reported the incident to Mrs. Juneau and that she told him that the two horses had been pastured separately due to recent trouble between the two. When asked about this conversation at trial, Mrs. Juneau testified that she had given what she termed as a “joking response.” She stated that the alleged altercation had occurred approximately one to two weeks before the incident now at issue and that, on this prior occasion, she had witnessed Banner chasing Pumpkin and her colt. Her testimony indicates that the horses had subsequently been separated. She further stated that, prior to his February 24th visit, she did not inform Burnaman about the problem between Banner and Pumpkin.
At the time of the July 9, 1997 jury trial, the parties stipulated that the matter would be bifurcated with the jury determining whether the defendants acted negligently or whether there was an unreasonable risk of harm. Causation and quantum were to be later decided by the trial judge. Following the presentation of evidence, the jury found that the plaintiff failed to prove his case under either a negligence or strict liability theory of recovery.
Burnaman now appeals assigning the following as error:
I. The jury committed legal error in finding that Byron and Maxine Juneau were not strictly liable for the accident of February [24], 1995.
II. The jury was manifestly erroneous in finding that Maxine Juneau was not negligent in causing the accident of February [24], 1995.
IsDiscussion
Strict Liability
The plaintiffs argue that the jury erred in concluding that the defendants’ horse did not create an unreasonable risk of harm. Burna-man asserts that the evidence does not indicate that he provoked the incident nor did he assume the risk of the situation as he had never experienced this type of unpredictable and violent behavior from the horses. Furthermore, he contends that the gentle nature of the horses, which was testified to by Mrs. Juneau and her son, does not preclude imposition of strict liability.
In part, La.Civ.Code art. 2321, as it existed at the time of the alleged incident, provides that “[t]he owner of an animal is answerable for the damage he has caused.” The Louisiana Supreme Court has interpreted Article 2321 as a strict liability theory of recovery. In Boyer v. Seal, 553 So.2d 827, 828 (La.1989), the supreme court summarized the plaintiffs burden of proof under Article 2321 as follows:
In order to recover under Civil Code article 2321, the plaintiff is required to prove that the domestic animal causing her damage was owned by the defendant, that the animal created an unreasonable risk of harm, and that her damage occurred through this risk.
Furthermore, the court in Boyer stated that the determination of whether there was an unreasonable risk of harm is “similar to that of taking into account all of the social, moral, economic and other considerations as would a legislator regulating the matter.” Id, at 835.
In the present case, the jury was presented with an interrogatory which asked as follows: “Do you find that Jerry Burnaman has proven, by a preponderance of the [ (-.evidence, that the horses, owned by Mr. and Mrs. Byron Juneau posed an unreasonable risk of harm to him on the day of the accident?” The jury indicated “No” finding that the plaintiff failed to sustain his burden of proof.
In our consideration of this matter, we are mindful that the unreasonable risk of harm determination is a factual question and, therefore, will not be reversed absent manifest error. Maxwell v. Board of Trustees, 96-1207 (LA.App. 3 Cir. 3/19/97); 692 So.2d 641, unit denied, 97-0996 (La.6/13/97); 695 So.2d 987.
Our review of the record reveals no manifest error in the jury’s determination. Rather, Burnaman was an experienced farrier who regularly performed work on the defendants’ horses. He stated that he had not experienced any problems with these horses until the date of the accident and, further, that he had even owned Banner *802 before the defendants had purchased him. He testified that, although the alleged incident was more violent, he had previously experienced horses pull their legs while he was performing farrier services.
Furthermore, the situation created by the horses was one created by Burnaman. His testimony indicates that he took the horses, which had been separately pastured, and allowed Pumpkin and her colt to remain in the same area as Banner while the plaintiff trimmed the horse’s hooves. Although he may not have expected the horses to react aggressively towards one another, this possibility, however limited, was created by him. We do not conclude that, in the presence of such factors, the jury was manifestly erroneous in concluding that the plaintiffs failed to prove that Juneaus’ horses created an unreasonable risk of harm.
17Negligence
Burnaman next maintains that the jury erred in finding that he failed to prove that the defendants were liable under a negligence theory of recovery.[2] In particular, the plaintiff asserts that Maxine Juneau was negligent in failing to tell him that Banner and Pumpkin had recently acted aggressively towards one another. He argues that she should have alerted him to this at the time he phoned to make the appointment.
In determining whether liability exists in a particular negligence case, the Louisiana Supreme Court has adopted a duty-risk analysis. Pitre v. Louisiana Tech Univ., 95-1466, 95-1487 (La.5/10/96); 673 So.2d 585, cert. denied, — U.S. -, 117 S.Ct. 509,136 L.Ed.2d 399 (1996). This analysis is composed of the following five inquiries:
(1) Was the conduct of which the plaintiff complains a cause-in-faet of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Whether the requisite duties were breached?
(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
(5) Were actual damages sustained?
| gld. at p. 8-9; 589-90 quoting Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). The plaintiffs failure to prove any of these elements precludes recovery. Id.
As the present case was a bifurcated trial, however, the jury was faced only with the questions of whether there was a duty and breach of that duty. The remainder of the inquiries were left to the trial court. The jury interrogatory reveals that the jury concluded that the plaintiffs did not prove that the defendants acted negligently on the day of the accident. Considering the testimony presented at trial, we do not find this determination manifestly erroneous.
Mrs. Juneau testified that she had seen Banner chasing Pumpkin and her colt approximately one to two weeks prior to the incident now at issue and that, as a result, the horses were separated. There does not appear to be anything so violent or unusual about the horse’s behavior to have required the jury to find that Mrs. Juneau should have informed the plaintiff, an experienced farrier, about the behavior.
Accordingly, this assignment is without merit.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assigned to the plaintiffs, Jerry and Jamie Burnaman.
AFFIRMED.

. In the petition instituted in this matter, as well as in the plaintiffs brief to this court, the accident is reported to have occurred on February 4, 1995. However, we will refer to the date of the accident as February 24, 1995 as the plaintiffs testimony and evidence introduced at trial indicate that this later date is the actual date' of the accident.

. La.Civ.Code art. 2315 provides, in part, as follows:
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.