933 So.2d 168 (2006)
Jake PALERMO
v.
The PORT OF NEW ORLEANS, et al.
Abraham Veal and Sheila Rochelle Veal
v.
The Port of New Orleans, et al.
Nos. 2004-CA-1804, 2004-CA-1805.
Court of Appeal of Louisiana, Fourth Circuit.
March 15, 2006.
Order Granting Rehearing May 17, 2006.
*170 Mickey P. Landry, Frank J. Swarr, David R. Cannella, Landry & Swarr, L.L.C., New Orleans, LA, for Jake Palermo, Abraham Veal and Sheila Rochelle Veal.
Joseph P. Tynan, Montgomery Barnett Brown Read Hammond & Mintz, L.L.P., and Francine Weaker, New Orleans, LA, and Henry E. Yoes, III, Yoes Law Firm, Lake Charles, LA, for Board of Commissioners of the Port of New Orleans.
Gary A. Lee, Richard M. Perles, A. Ann Cates, Patricia C. Penton, Lee, Futrell & Perles, L.L.P., New Orleans, LA, for Dixie Machine Welding & Metal Works, Inc.
H. Philip Radecker, Jr., Montgomery Barnett Brown Read Hammond & Mintz, L.L.P., New Orleans, LA, for Buck Kreighs Company, Inc.
Lawrence C. Pugh, III, Edward R. McGowan, Alison S. Borisen, Montgomery Barnett Brown Read Hammond & Mintz, L.L.P., New Orleans, LA, for Eagle, Inc.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge MAX N. TOBIAS, JR., Judge EDWIN A. LOMBARD).
PATRICIA RIVET MURRAY, Judge.
These consolidated cases[1] were instituted by the adult offspring of two individuals, Jake Palermo and Abraham Veal, whose deaths were allegedly caused by occupational exposure to asbestos from their work on the wharves on the Mississippi River in New Orleans. Four defendants, namely: the Port of New Orleans ["the Dock Board"]; Eagle, Inc. ["Eagle"]; *171 Buck Kreihs Company, Inc. ["B.K."]; and Dixie Machine, Welding & Iron Works, Inc. ["Dixie"], appeal the trial court's judgment in favor of plaintiffs. For the reasons that follow, we reverse.

PROCEDURAL HISTORY
Plaintiffs, Sheila Palermo Allgood, Frances Palermo, and Robin Palermo, filed the instant lawsuit alleging that their deceased father, Jake Palermo, contracted lung cancer as a result of his exposure to asbestos on a daily basis while he worked as a cooper, sack sewer, sweeper, and water boy on the wharves on the Mississippi River in New Orleans from approximately 1962 until 1982. Similarly, plaintiff Sheila Veal alleges that her father, Abraham Veal, contracted mesothelioma as a result of his exposure to asbestos while loading and unloading cargo as a longshoreman on the same wharves during approximately the same time period as Mr. Palermo. Mr. Palermo died April 14, 2003, at the age of 76, from a self-inflicted gunshot wound; plaintiffs allege that his depression-induced suicide was causally related to his terminal lung cancer. Mr. Veal was diagnosed with mesothelioma, an asbestos-related cancer, in July of 2003 and died from the disease on October 13, 2003, at the age of 61.
The plaintiffs filed the instant survival/wrongful death action against numerous corporate defendants, including the employers of Mr. Palermo and Mr. Veal; various manufacturers/shippers of asbestos and asbestos-containing products; the Dock Board; and several ship repair companies. The employers and manufacturers settled with plaintiffs prior to trial.[2] In March, 2004, a bench trial was held against the remaining defendants, namely: Dixie, B.K., and Eagle [collectively referred to as "the ship repair companies"]; and the Dock Board.[3] The trial concluded March 22, and judgment was rendered March 25, 2004. The trial court found defendants liable and awarded damages as follows:
I. In the Palermo survival action, in favor of Jake Palermo against all four defendants, namely, the Dock Board, Dixie, Eagle, and B.K., damages in the amount of $500,000 "per plaintiff;"
II. In the Palermo wrongful death action, in favor of the three Palermo daughters against the same four defendants, damages in the amount of $1,000,000;
III. In the Veal survival action, in favor of Abraham Veal against three defendants, namely, the Dock Board, Dixie and Eagle,[4] damages in the amount of $500,000; and
IV. In the Veal wrongful death action, in favor of Sheila Veal against the same three defendants, damages in the amount of $2,000,000.
Additionally, the trial court's judgment included the following statement: "IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that both of the plaintiffs' judgments in the survival action are reduced by a virile share for the liability with whom plaintiffs settled prior to trial."
*172 In accompanying Reasons for Judgment, the trial court expressed his findings of fact and conclusions of law, which are summarized as follows: (1) Jake Palermo's depression-induced suicide was a direct result of his occupational exposure to asbestos; (2) Abraham Veal's death from mesothelioma was a direct result of his occupational exposure to asbestos; (3) The Dock Board had a duty to provide Mr. Palermo and Mr. Veal with a safe work environment, which duty it breached by failing to provide plaintiffs with proper safety equipment, failing to properly ventilate the facilities where asbestos products were stored, and failing to properly maintain the wharves and wharf facilities; (4) B.K. conducted maintenance and repair work on vessels docked at the New Orleans wharves during the same time period the plaintiffs were employed there; (5) Dixie was a ship repair company that performed and subcontracted asbestos insulation work on the same wharves during the relevant time period; (6) Eagle was an insulation company that did a vast majority of the insulation work for B.K. during the relevant time period; (7) B.K., Dixie and Eagle knew that their work triggered the release of asbestos fibers into the environment in the vicinity of workers such as the plaintiffs and were negligent for failing to segregate their work and / or failing to warn of this danger; (8) The exposure of plaintiffs to asbestos as a result of the fault of each of the defendants (the Dock Board, B.K., Dixie, and Eagle) was a substantial contributing factor in causing the illnesses and deaths of both Jake Palermo and Abraham Veal.
On April 1, 2004, plaintiffs filed a motion to amend the judgment and/or for a new trial, asserting two grounds: that the statement in the judgment ordering the survival action awards to be reduced by "a virile share" should be stricken from the judgment as being contrary to the law and evidence; and that amounts of general damages awarded for the suffering of Jake Palermo and Abraham Veal were inadequate. On April 4, 2004, Dixie filed a motion for partial new trial asserting that the portion of the judgment referring to reduction of the survival awards by "a virile share" should be amended to specifically set forth the appropriate number of virile share credits according to the number of defendants each plaintiff settled with prior to trial.[5] The trial court denied both the plaintiffs' motion and Dixie's motion on June 29, 2004.
The Dock Board, B.K., Dixie, and Eagle filed the instant appeal. The plaintiffs did not answer the appeal, nor appeal in their own right.
The appellants assert numerous assignments of error,[6] which raise both legal and factual issues. The alleged errors of law include: (1) the wording of the statement in the judgment regarding the "virile share" credit, and the failure of the trial court to determine the applicable number of virile shares; (2) the trial court's awarding of damages in the Palermo survival action as a designated amount "per plaintiff;" (3) the failure of the trial court in the wrongful death actions to assign comparative fault to the plaintiffs' employers and/or to the manufacturers with whom the plaintiffs settled prior to trial; (4) the trial court's finding that the Dock Board owed a legal duty to protect or warn the plaintiffs from their potential exposure to *173 asbestos; (5) the trial court's finding that the ship repairers owed a legal duty to protect or warn the non-employee plaintiffs from their potential exposure to asbestos; and (6) various evidentiary rulings made by the trial court.[7] The alleged errors of fact include: (1) the trial court's finding that the Dock Board was negligent; (2) the trial court's finding that the negligence of the Dock Board exposed Jake Palermo and Abraham Veal to asbestos at a level sufficient to be considered a contributing factor in the causation of their respective diseases; (3) the trial court's finding that the ship repairers were negligent; (4) the trial court's finding that the negligence of the ship repairers exposed Jake Palermo and Abraham Veal to asbestos at a level sufficient to be considered a contributing factor in the causation of their respective diseases; (5) the failure of the trial court to find that Jake Palermo's suicide was an independent, intervening cause and therefore, the sole legal cause, of his death; (6) the failure of the trial court to find that Jake Palermo's history of smoking constituted contributory negligence which barred his survival action;[8] (7) the failure of the trial court to assign any degree of comparative fault in the Palermo wrongful death action to Jake Palermo himself on account of his history of smoking; and (8) the awarding of an excessive amount of damages in the Palermo survival action, the Palermo wrongful death action, and the Veal wrongful death action.

INTERPRETATION OF THE JUDGMENT
We first address the alleged legal errors or discrepancies on the face of the judgment. The first issue is the virile share language in the judgment, which states that the survival awards are to be reduced by "a virile share for the liability with whom plaintiffs settled prior to trial." All parties recognize that this provision is ambiguous and therefore, is unenforceable as written; however, the plaintiffs and defendants disagree as to how the ambiguity should be resolved.
The law on this issue is settled. The Louisiana Supreme Court has held that in asbestos exposure cases such as the instant one, where the substantial injury-producing exposures giving rise to the plaintiffs' claims occurred prior to the August 1, 1980, adoption of the Comparative Fault Law, pre-comparative fault law applies. According to this law, the damage awards in the Palermo and Veal survival actions must be reduced by one virile share for each defendant that the respective plaintiff settled with and released, as long as the liability of that defendant has been proven at trial. See Cole v. Celotex Corp., 599 So.2d 1058, 1067-1072 (La. 1992). The plaintiffs in the instant case stipulated on the record to having settled with and released at least seven defendants.[9] Although the judgment and the *174 record as a whole reflect that the trial court found liability on the part of these defendants, the judgment not only fails to specify the number of virile shares, but also fails to acknowledge that multiple virile shares are applicable.
Faced with this anomaly, defendants argue that, according to the law, the damage awards must be reduced by a virile share for the liability of each defendant with whom the plaintiffs settled. They further contend that the trial court inadvertently omitted the phrase "of each defendant" from the virile share provision in the judgment. The defendants also point out that the plaintiffs have not appealed the trial court's finding of liability on the part of the settling defendants, and they urge this court to determine the appropriate number of virile shares from the record and to reduce the survival awards accordingly.
Conversely, the plaintiffs argue that the virile share provision in the judgment is merely "extraneous language," which should be omitted in its entirety. They argue that the judgment does not reflect a finding of liability on the part of the settling defendants, and alternatively, that this court should determine, based on the record, that the defendants failed to prove the liability of the settling defendants.
We find the defendants' argument to be more convincing. Our conclusion is based upon two considerations: the language of the judgment itself; and the general principles of legal interpretation; which dictate that, where possible, a provision in a judgment should be interpreted such that it is consistent with the other (unambiguous) provisions in the same judgment, and such that the judgment as a whole is consistent with the evidence in the record It is reasonable to assume that the trial court would not have included in the judgment a separate paragraph ordering the survival awards to be reduced on account of the liability of parties with whom the plaintiffs had settled prior to trial unless the court had determined that those parties were so liable. Moreover, upon review, the record unequivocally reflects that the liability of the settling defendants was proven at trial. Accordingly, we interpret the trial court's judgment as requiring that the survival damage awards be reduced by one virile share for the liability of each defendant with whom the particular plaintiff settled prior to trial.[10]
The second issue relating to the interpretation of the judgment is the meaning of the trial court's award in the Palermo survival action of damages in the amount of $500,000 "per plaintiff." Louisiana Civil Code article 2315.1 provides that the surviving children of a deceased individual may bring an action to recover damages for injury to the deceased caused by an offense or quasi-offense. Such an action, referred to in the jurisprudence as a "survival action," is clearly limited to recovery of the damages suffered by the deceased from the time of injury until the moment of death. Taylor v. Giddens, 618 So.2d 834, 840 (La.1993); Ly v. State, Through Dep't of Public Safety and Corrections, 633 So.2d 197, 206 (La.App. 1st Cir.1993). Therefore, the survival action is a single cause of action. In Gibbs v. Magnolia Living Center, Inc., 38,184, p. 6 (La. App. 2 Cir. 4/7/04), 870 So.2d 1111, 1115, the court held that the delictual obligation of the tortfeasor to pay for damages suffered by the victim before her death represented a single performance owed to all beneficiaries of the deceased, which was divisible among those beneficiaries.
*175 In view of the settled law, therefore, we are compelled to interpret the trial court's judgment as providing for only one award in the Palermo survival action, which award is shared by the three daughters of Jake Palermo. The appellants contend that the trial court's award of "500,000 per plaintiff" should be interpreted as a single $500,000 award on behalf of Jake Palermo, who is the true plaintiff in the survival action. The appellees do not specifically address this issue, other than to argue that the trial court inadvertently "switched" the amounts it awarded in both the Palermo and Veal survival actions with those it awarded for the wrongful deaths of each decedent, suggesting that this court should now reform the judgment by reversing those amounts. Considering that the trial court denied both a motion to amend the judgment and a motion for new trial, we find the appellees' argument to be circumspect. Moreover, under well-settled law, parties who seek to have the judgment of the trial court revised, modified, set aside or reversed must either appeal in their own right or file an answer to the appeal. See Walker v. Clarendon National Ins. Co., 01-2338 (La.12/14/01), 802 So.2d 1285. In the instant case, as the plaintiffs have not filed an answer to the appeal, the modification of the judgment they seek is prohibited.
Accordingly, we interpret the language of the trial court's judgment as providing for one award of $500,000 to the plaintiff, Jake Palermo, in the survival action brought on his behalf by his three children. We now turn to the substantive issues of this appeal.

LIABILITY

The Dock Board
In its reasons for judgment, the trial court indicated that its finding of liability on the part of the Dock Board was based upon the Dock Board's breach of its duty to provide the plaintiffs with a safe work environment. Specifically, the trial court noted that the Dock Board was negligent for failing to provide the plaintiffs with safety equipment to protect them from the known dangers of asbestos, and for failing to property maintain its facilities. The Dock Board contends that the trial court's finding of liability based on negligence is erroneous because the Dock Board had no legal duty to protect Jake Palermo or Abraham Veal from the hazards posed by asbestos exposure in their employment. Regarding the issue of whether such a duty existed, the Dock Board contends the instant case is indistinguishable from Faulkner v. The McCarty Corp., 02-1337 (La.App. 4 Cir. 6/11/03), 853 So.2d 24. Alternatively, the Dock Board argues it cannot be held strictly liable to the plaintiffs because the asbestos cargo itself, as well as the wharf facilities where the cargo was loaded, unloaded and held, were, at all pertinent times, under the care, custody and control of the stevedoring companies (plaintiffs' employers), rather than of the Dock Board.[11] Finally, the Dock Board argues that it cannot be held strictly liable as the owner of a defective building because there was no proof that a defect existed in any of its structures.
Liability based on negligence is determined under a duty-risk analysis, which is applied on a case-by-case basis. Faulkner, supra, p. 4, 853 So.2d at 28. (citing McGuire v. New Orleans City Park Improvement Ass'n, 02-1401, p. 6 (La.1/14/03), 835 So.2d 416, 420). To prove negligence under this analysis, the plaintiff *176 must show four elements: 1) the conduct in question was the cause-in-fact of the resulting harm; 2) the defendant owed a duty of care to the plaintiff; 3) the defendant breached that requisite duty; and 4) the risk of harm was within the scope of protection afforded by the duty breached. Id. If the plaintiff fails to prove one of these elements, the defendant is not liable. Id. (citing Pitre v. Louisiana Tech University, 95-1466, 95-1487 (La.5/10/96), 673 So.2d 585).
Absent a duty to the plaintiff, there can be no actionable negligence and hence no liability. Id. at p. 5, 835 So.2d at 419 (citing Polk v. Blanque, 93-1740 (La. App. 4 Cir. 3/15/94), 633 So.2d 1382, 1387). "Duty is a question of law: simply put, the inquiry is whether the plaintiff has any lawstatutory or jurisprudentialto support his claim that the defendant owes him a duty." Id., pp. 4-5, 853 So.2d at 27. As a matter of law, the trial court's determination that a duty exists is subject to de novo review. Perkins v. Entergy Corp., 98-2081, 98-2082, 98-2083, p. 22 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, 403 (citation omitted).
The trial court concluded that the Dock Board breached its duty to provide the plaintiffs with a safe workplace. However, plaintiffs cite no statutory or jurisprudential authority, nor have we found any, that imposes on a non-employer, such as the Dock Board, the duty to provide employees with a safe workplace. As the Dock Board points out, both federal and state law unequivocally impose this duty on the stevedore's employer. See: 29 U.S.C. § 654; La. R.S. 23:13. La. R.S. 23:13 states:
Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees.
Through the testimony of their expert, industrial hygienist Frank Parker, III, plaintiffs introduced into evidence several other state and federal laws upon which they contend the duty of the Dock Board is based. These include three state statutes: La. R.S. 34:21, 34:22 and 34:25, and three federal statutes: the Shipping Act of 1916, the Walsh-Healy Act, and the Occupational Safety and Health Act ["OSHA"]. Upon careful review, we conclude that none of these laws imposes a legal duty upon the Dock Board to protect the plaintiffs under the circumstances of this case. La. R.S. 34:21 (commonly referred to as the "enabling statute" of the Dock Board) provides that the Dock Board "shall regulate the commerce and traffic of the port and harbor of New Orleans in such a manner as may, in its judgment, be best for the maintenance and development thereof." La. R.S. 34:22 concerns the Dock Board's control over structures built and maintained by riparian landowners on their batture or banks within the limits of the port of New Orleans. La. R.S. 34:25 empowers the Dock Board to make rules and regulations "for the conduct, management, and control of the port, its commerce, traffic and navigation, the waters and landings within its territorial jurisdiction, the structures and other facilities under its administration, and for the government thereof, which may, in its judgment, be necessary or proper in the exercise of *177 the powers now conferred upon it by the constitution and statutes of the state of Louisiana," including rules governing the control and use of docks, wharves, and warehouses, and the loading and unloading of cargo. The two state statutes that arguably apply to the instant situation, namely La. R.S. 34:21 and 34:25, clearly do not impose a duty on the Dock Board to protect the employees of stevedoring companies from the hazards of working near asbestos cargo and its debris; they merely give the Dock Board the power to make whatever rules it deems necessary to facilitate commerce at the port. Because the determination of specific rules is clearly discretionary on the part of the Dock Board, its failure to act to protect the stevedore's employees cannot be considered a breach of any duty owed to them.[12]
Nor do any of the three federal statutes cited by plaintiffs impose a duty on the Dock Board under these circumstances. The Shipping Act of 1916, or 46 U.S.C.App. § 801, et seq., delineates the responsibilities of the former U.S. Maritime Commission (now the Federal Maritime Commission), regarding the rates charged by port terminal operators to carriers and shippers of cargo; the focus of the Act is to prevent the giving of preferential rates to certain carriers, and it has no provisions relating to safety. The Walsh-Healy Act, 41 U.S.C. § 35, et seq., by its very terms applies only to contracts between the United States government or the District of Columbia and third parties; it is not applicable to state government entities, such as the Dock Board. Finally, OSHA applies only to employers with respect to providing safety for their employees. See 29 U.S.C. § 654. Moreover, the term "Employer" is specifically defined as excluding the United States, any state, and any political subdivision of a state. See 29 U.S.C. § 652(5). Therefore, we conclude that plaintiffs have not cited any statutory authority for the imposition of a duty upon the Dock Board with respect to them.
Because the Dock Board leased its wharves to the various stevedoring companies who employed Mr. Palermo and Mr. Veal, we must determine whether the Dock Board owed a duty to the plaintiffs as a product of the lessor/lessee relationship between the Dock Board and the plaintiffs' various employers.[13]La. R.S. 9:3221 provides:
The owner of premises leased under a contract whereby the lessee assumes responsibility for their condition is not liable for injury caused by any defect therein to the lessee or anyone of the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time.
Therefore, even if a property owner has contracted away his responsibility for maintaining his premises to his lessee, the owner can still be held liable if he knew or should have known of a defect in the property and failed to remedy it within a reasonable time. Faulkner, supra, p. 6; 853 So.2d at 29 (citing Audler v. Board of Comm'rs of the Port of New Orleans, 617 So.2d 73, 77 (La.App. 4th Cir.1993)).
The evidence in the instant case unequivocally demonstrates that the Dock *178 Board leased its facilities to the stevedoring companies, which had the complete responsibility for all cargo operations including loading, unloading and cleanup of cargo debris resulting from those activities. Nevertheless, plaintiffs contend that the Dock Board is negligent for allowing them to be exposed to asbestos as a result of these cargo operations. The trial court held that the Dock Board was liable for its failure to maintain its facilities. Based on the law cited above, however, the Dock Board owed a duty to the plaintiffs only if the wharf facilities themselves were defective, and the Dock Board knew or should have known of that condition but failed to remedy it within a reasonable time.
Although plaintiffs presented evidence that exposure to asbestos cargo, as well as to the airborne fibers and debris generated by that cargo was dangerous, there was no evidence to show that the mere presence of that cargo made the wharves themselves defective. In addition, even assuming a defective condition existed, plaintiffs presented no evidence that the Dock Board knew or should have known of such a condition. The only evidence concerning the Dock Board's knowledge was produced in connection with the testimony of Michael Orlesh, special counsel for the Port of New Orleans. Mr. Orlesh testified that the Dock Board assigned specific wharf facilities pursuant to tariffs, and that these assignments (equivalent to leases) gave the assignees complete control of the facility for the period of the contract. Mr. Orlesh denied that the Dock Board had any specific knowledge that asbestos-containing cargo was being shipped through its facilities. He testified that the Dock Board was not advised of the type of cargo being shipped in advance of its arrival; in fact, the only documentation received by the Dock Board were the written manifests of cargo that the Dock Board typically received long after the vessel delivering the cargo had departed. Although the Dock Board had the right to inspect its facilities and to charge terminal operators who failed to clean up the facilities, there was no evidence that the Dock Board had ever exercised this right.
In addition to arguing that the asbestos debris made the wharves defective, plaintiffs also contend the condition of a specific port facility, known as the Public Commodities Warehouse or the "Cotton Warehouse," constituted a defect in the Dock Board's facilities. The evidence showed that the Cotton Warehouse was a cargo storage area also assigned to various stevedoring companies. The plaintiffs contend that the Cotton Warehouse was defective because it was not properly ventilated and because of the presence of steam boilers with pipes containing asbestos insulation. With regard to ventilation, we find that there was no evidence that the Dock Board knew or should have known that there was a danger from asbestos debris in the warehouse which could have been alleviated by increased ventilation. The plaintiffs presented no evidence to show the ventilation of the facility was not in keeping with industry standards. Moreover, the issue of whether increased ventilation would have helped protect the longshoremen was disputed at trial. The plaintiffs' industrial hygienist, Frank Parker, III, opined that there was inadequate ventilation in the Cotton Warehouse, but the defendants' expert in the same field, Tracey Dodd, opined that no amount of ventilation would have protected the workers from exposure to asbestos and that more ventilation could have actually worsened the exposure by distributing the airborne fibers. Mr. Parker also stated that the only way to ensure the workers were protected was to have them wear protective face masks. Considering the evidence, we cannot find that the lack of ventilation *179 constituted a defect for which the Dock Board is responsible.
Plaintiffs' other argument is that the Cotton Warehouse was defective because it contained old steam boilers from an era when asbestos insulation was typically used on the pipes. The only evidence that the boilers in question contained asbestos was the testimony of one fact witness, a longshoreman named Jules Waguespack, who testified that he observed asbestos insulation on the pipes. However, the plaintiffs' own expert, Mr. Parker, stated he would not be able to tell from merely looking at insulation wrapped around a pipe whether that insulation contained asbestos.
Another issue in dispute at trial was whether these boilers were physically segregated (in a separate area) from the rest of the Cotton Warehouse. However, it was undisputed that the boilers were inactive during the time period in question. Although there was circumstantial evidence that Mr. Palermo and Mr. Veal probably worked in the Cotton Warehouse at times, there was no evidence that either ever worked on or near the boilers, as their jobs did not include repairing pipes. Finally, there was no evidence that asbestos insulation, assuming such was on the pipes, posed a danger to those in the vicinity of it unless it was disturbed. Tracey Dodd stated that insulation on a pipe or a boiler creates an exposure hazard only if it is disturbed. Mr. Parker did not specifically address this issue in relation to the boilers, but did testify that, in general, asbestos fibers are generated when asbestos-containing material is disturbed. Jules Waguespack, the witness who said he observed asbestos insulation on the boiler pipes, also testified that the insulation he saw had not been disturbed. Therefore, as the plaintiffs presented no evidence to show that the pipe insulation was ever disturbed during the time period in question, we cannot find that its mere presence in the boilers constituted a defect in the Cotton Warehouse for which the Dock Board could be held liable under La. R.S. 9:3221.
Another argument of the plaintiffs concerning the duty of the Dock Board is that the Dock Board should have been held strictly liable under either Louisiana Civil Code article 2317 as the owner of a defective thing or article 2322 as the owner of a ruinous building.[14] To prove liability under article 2317, the plaintiff must establish that:
1) The thing which caused injury must be in the care, custody and control of the defendant;
2) The thing had a vice or defect which created an unreasonable risk of harm;
3) The injuries in question were caused by said defect.
See Faulkner, supra, p. 7, 853 So.2d at 29 (citing Borruano v. City of Plaquemine, 97-1926 (La.App. 1st Cir.9/25/98), 720 So.2d 62, 64).
In the instant case, the evidence established that the cargo and the cleanup of its debris on the wharves and in the Cotton Warehouse were clearly in the care, custody and control of the stevedore companies / lessees rather than of the Dock Board. Moreover, the Cotton Warehouse, which arguably can be considered to have been in the custody and control of the Dock Board only with regard to the *180 steam boilers, did not present an unreasonable risk of harm to the longshoremen working there unless the asbestos insulation, assuming it existed, was being disturbed. As there was no evidence of it being disturbed, the presence of the boilers did not constitute a vice or defect that presented an unreasonable risk of harm pursuant to Article 2317.
To prove liability under article 2322, the plaintiff must show that the defendant was the owner of a building, that the building was in "ruin" on account of a vice in its construction or the neglect of repair, and that the ruinous condition caused the damages sought to be recovered. See Olsen v. Shell Oil Co., 365 So.2d 1285, 1289 (La. 1978). For the same reasons we have stated concerning the lack of proof of a defect in the wharves or the Cotton Warehouse, we find no proof in this record that the Dock Board's facilities were in a ruinous condition. Accordingly, we reject the plaintiffs' contention that the Dock Board owed them a duty under the theory of strict liability.
Finally, plaintiffs argue that we are compelled to find a duty exists in this case on the basis of our reasoning in the recent case, Zimko v.American Cyanamid, 03-0658 (La.App. 4 Cir. 6/8/05), 905 So.2d 465. In Zimko, we affirmed the trial court's finding of a duty on the part of the plaintiff's employer to act reasonably to prevent the foreseeable risks incurred by household members of its employees from exposure to asbestos fibers carried home on the employees' bodies or clothes. In so doing, we noted that a "no duty" defense in a general negligence case is seldom appropriate, and that analysis of the defendant's conduct should instead be done in terms of whether there has been a breach of duty. Id., pp. 22-23, 905 So.2d at 482-83 (discussing Justice Lemmon's concurrence in Pitre v. Louisiana Tech University, 95-1466 (La.5/10/96), 673 So.2d 585, 596). However, the facts in Zimko led us to conclude that the employer, American Cyanamid, had breached its general duty to act reasonably in preventing a foreseeable risk of harm to a specific group of people (employees' household members) who could be affected by its business operations. Unlike in Zimko, the evidence in the instant case does not support a finding that the Dock Board breached its duty to act reasonably in preventing a foreseeable risk of harm from asbestos exposure to those working on the wharves during the relevant time period. Whether the Dock Board knew generally that asbestos was being shipped through the port is irrelevant to this inquiry; absent a defect in its premises, which we have already discussed, the pertinent fact is that the Dock Board had no custody or control of the asbestos-containing cargo or of the loading, unloading or ship repair operations.
We therefore conclude that the trial court committed legal error by finding that the Dock Board breached a duty to protect the plaintiffs under the circumstances presented in this case. We also agree with the Dock Board's assertion that, with respect to this issue, the instant case is indistinguishable from Faulkner v. The McCarty Corp., supra. In Faulkner, we concluded that the Dock Board owed no duty to the plaintiff, a longshoreman who had contracted mesothelioma as a result of his occupational exposure to asbestos while loading and unloading cargo on the New Orleans wharves from 1951 until 1989. In that case, as in this one, we considered and rejected every possible basis in the law for the existence of a duty on the part of the Dock Board to protect longshoremen working on the New Orleans riverfront during the same time period from occupational exposure to asbestos. In Faulkner, we affirmed the trial court's finding that no duty existed after conducting a de novo *181 review. Plaintiffs contend that the instant case is distinguishable from Faulkner because the plaintiffs herein presented evidence that the Dock Board's facilities were defective due to lack of ventilation in the Cotton Warehouse and/ or the presence of deteriorated asbestos insulation in the dormant boilers located in the Cotton Warehouse. However, for the reasons previously stated in our discussion of plaintiffs' strict liability claim, we find this evidence falls far short of that required by law to prove the existence of a defect in the premises.
Therefore, for essentially the same reasons as in Faulkner, we conclude after conducting a de novo review of this record that the trial court committed legal error by finding the Dock Board owed a duty to Mr. Palermo and Mr. Veal in the instant case.

The Ship Repair Companies
According to the Reasons for Judgment, the trial court found the ship repair companies liable for the failure to warn of the dangers of asbestos, the failure to segregate their activities from the plaintiffs, and the failure to provide a safe workplace. The defendants argue that there was no special duty on the part of the ship repair companies, because they were neither employers of the plaintiffs nor manufacturers of asbestos-containing products, to provide plaintiffs with a safe workplace or to warn of the dangers of asbestos exposure. We agree that the duty to provide a safe workplace is generally that of the plaintiff's employer. See Kent v. Gulf States Utilities Co., 418 So.2d 493, 500 (La.1982). Nevertheless, the ship repair companies in this case had a general duty to act reasonably to prevent any foreseeable risks of harm to the plaintiffs from asbestos exposure that might be caused by proximity of their operations to the plaintiffs' employment activities. The trial court found that the ship repair companies breached this duty and that their breach contributed to the deaths of Mr. Palermo and Mr. Veal. Our review of this finding is subject to the manifest error standard. See Quick v. Murphy Oil Co., 93-2267 (La.App. 4 Cir. 9/20/94), 643 So.2d 1291, 1292.
To prove negligence under a duty-risk analysis, the plaintiff must prove that: (1) the conduct in question was the cause-in-fact of the resulting harm; (2) the defendant owed a duty of care to the plaintiff; (3) the defendant breached that requisite duty; and (4) the risk of harm was within the scope of protection afforded by the duty breached. Faulkner v. The McCarty Corporation, supra, p. 4, 853 So.2d at 28. As this court has stated, the first element of proof of a negligence claim is causation. Quick v. Murphy Oil Co., supra, 643 So.2d at 1295. Moreover, we have noted that in asbestos litigation, because of the lengthy latency period between exposure and manifestation of the disease, causation is said to be the "premier hurdle" faced by plaintiffs. Zimko v. American Cyanamid, supra, p. 25, 905 So.2d at 484 (citing Torrejon v. Mobil Oil Co., 03-1426, pp. 18-19 (La.App. 4 Cir. 6/2/04), 876 So.2d 877, 890-91). To determine whether a particular source of exposure to asbestos was a cause-in-fact of a plaintiff's asbestos-related disease, Louisiana courts employ a "substantial factor" test. Simply stated, the particular exposure must be a substantial contributing factor to the plaintiff's disease. Zimko, p. 26, 905 So.2d at 485. As this court stated in Vodanovich v. A.P. Green Industries, Inc., 03-1079, pp. 3-4 (La.App. 4 Cir. 3/3/04), 869 So.2d 930, 932-33:
When multiple causes of injury are present, a defendant's conduct is a cause in fact if it is a substantial factor generating plaintiff's harm. Quick *182 v. Murphy Oil Company, 93-2267 (La.App. 4th Cir.9/20/04), 643 So.2d 1291.
There can be more than one cause in fact of an accident as long as each cause bears a proximate relation to the harm that occurs and it is substantial in nature.
Moreover, as we also pointed out in Vodanovich, "Quick makes it clear that a plaintiff's burden of proof against multiple defendants in a long-latency case is not relaxed or reduced because of the degree of difficulty that might ensue in proving the contribution of each defendant ... to the plaintiff's injury." Vodanovich, p. 4, 869 So.2d at 933.
The trial court's finding of causation is a factual finding that should not be disturbed unless the record does not furnish a basis for that finding, and it is clearly wrong or manifestly erroneous. Zimko, p. 29, 905 So.2d at 486 (citing Egan v. Kaiser Aluminum & Chemical Corp., 94-1939, p. 11 (La.App. 4 Cir. 5/22/96), 677 So.2d 1027, 1034) (citations omitted). Our review of the record in the instant case discloses that there is no basis in evidence to support the conclusion that the activities of the ship repairer defendants caused either Jake Palermo or Abraham Veal to be exposed to asbestos to the extent necessary for such exposure to constitute a substantial contributing factor in bringing about his disease.
The evidence regarding the nature and extent of the plaintiffs' possible exposure from the ship repair companies' activities was circumstantial; that is, no witness testified that he ever on any occasion observed either plaintiff in close proximity to a ship repair company's operation that involved working with asbestos-containing material, such as pipe insulation. Mr. Palermo died before he could testify. Mr. Veal's testimony, which was perpetuated by deposition, established that his regular work as a longshoreman involved the handling of asbestos cargo. However, Mr. Veal was not questioned about, nor did he mention, any ship repair companies or insulation contractors or their operations in his testimony. The plaintiffs' case on causation was based upon seven fact witnesses, all of whom worked as longshoremen and/or coopers and water boys on the wharves during generally the same time period as the plaintiffs, and some of whom specifically recalled having worked with either Jake Palermo or Abraham Veal. These witnesses included:
(1) Earl Lindsay, who knew both Mr. Palermo and Mr. Veal;
(2) Jules Waguespack, Jr., Harry Mendoza, and Duralph Hayes, Jr., all of whom worked with Jake Palermo;
(3) Willie Earls and Charles Dunbar, both of whom worked with Abraham Veal; and
(4) Anthony Rabito, who did not know either Mr. Palermo or Mr. Veal.
Each of these witnesses testified that their occupations and those of Mr. Palermo and Mr. Veal involved contact with asbestos-laden cargo, that they were never warned about the dangers of such contact by the manufacturers or shippers of the cargo, and that their stevedore company employers never provided them with respirators or protective clothing. Their testimony established that during the years the plaintiffs worked on the New Orleans wharves, longshoremen desiring to work would merely show up at the foot of Canal Street each morning and would be hired by whichever stevedore company needed workers that day. Collectively, the testimony of these witnesses clearly established that Abraham Veal, a stevedore, was regularly exposed to asbestos fibers by loading and unloading to and from vessels burlap sacks of raw asbestos and paper *183 bags of refined asbestos, which bags often tore and broke; and further that Jake Palermo, as a cooper / water boy, was required on a regular basis to sweep up spilled asbestos cargo, sew up torn sacks of asbestos, and deliver water to stevedores in the ships' hatches and on the wharves while they were loading and unloading asbestos cargo. Thus, their testimony unequivocally established that both plaintiffs were substantially exposed to harmful asbestos fibers simply by virtue of their occupations.
Regarding any additional asbestos exposure that may have occurred because of the plaintiffs' proximity to the operations of the ship repair companies/defendants, however, the testimony of the fact witnesses diverges. Earl Lindsay, a longshoreman who recalled both plaintiffs but could not recall a specific occasion when he worked with Mr. Veal, said that stevedores generally worked on the ship at the same time as employees of ship repair companies such as Dixie and B.K. He could not recall any insulation contractors, and was not aware of the fact that they also sometimes worked aboard the ships. He indicated that the only type of ship repair that was routinely segregated from the cargo operations was welding work. He also said he saw workers he believed were employees of ship repair companies remove and rewrap insulation from vessel railings, which insulation he believed contained asbestos.
Harry Mendoza (a stevedore) and Duralph Hayes, Jr. (a cooper), who both worked with Mr. Palermo, corroborated Mr. Lindsay's testimony that ship repairers and stevedores worked on a ship at the same time. Mr. Hayes also testified that a cooper such as Mr. Palermo would have worked around ship repairers, whose work was not segregated. Mr. Hayes stated that ship repairers repaired asbestos insulation on boiler pipes in the engine rooms of ships and on steam winches; they also did many other types of repairs, such as to metal objects on deck, like railings and hatches. Mr. Hayes admitted that the only repair work on deck that would have involved asbestos insulation was the repair of early steam-powered winches, but he did not testify to ever having observed Mr. Palermo in the vicinity of such repairs. Mr. Mendoza testified that most of the ship repairers' work consisted of welding. He recalled Dixie and "Buck Kern" as ship repair companies working at that time. Mr. Waguespack, who also worked with Mr. Palermo, testified that he on one occasion saw Mr. Palermo working within forty feet of some insulation material that presumably had been torn off a boiler and left in a pile on the dock; however, the witness did not know who had placed the material there, although he had seen the truck of an unidentified ship repair company nearby. He did not testify to having seen Mr. Palermo in the vicinity of ongoing work with insulation.
Willie Earls, who worked with Abraham Veal, spent all his time as a longshoreman working in the cargo holds of vessels. He testified that ship repair companies sometimes also worked in the cargo holds at the same time, approximately twenty feet away from him, but he had no idea what type of repairs they were doing, nor could he recall the names of any of the ship repair companies. Charles Dunbar, a longshoreman who also worked with Mr. Veal, recalled that ship repair companies worked on the vessels, but the only type of work he could recall them doing was welding.
Anthony Rabito differed significantly from plaintiffs' other fact witnesses because from 1961 until 1965, he worked as a helper for several ship repair companies, including defendant Dixie. Beginning in *184 1965, Mr. Rabito worked as a stevedore. Mr. Rabito did not know either Mr. Palermo or Mr. Veal. While working for the ship repair companies, he handled insulation, but he did not know whether it contained asbestos. He stated that the insulation work handled by the ship repair companies was small in scope, such as changing a small amount of insulation, and that larger jobs were farmed out to other companies (presumably insulation contractors). He testified that repairing the older steam winches could involve removal of a small amount of insulation, but agreed that steam winches had been completely replaced by electric winches, which had no insulation, by the end of his tenure as a stevedore in 1971. He also agreed on cross-examination that winch repair on deck comprised a small fraction of the ship repair companies' work, most of which was done in the engine or boiler rooms of ships. During winch repair on deck, a stevedore could be no closer than the opposite side of the cargo hatch. Mr. Rabito was unable to estimate the distance between the repair operation and the stevedore, other than to say it was approximately the length of the courtroom. Mr. Rabito also confirmed that ship repair companies conducted many types of repair on deck that did not involve insulation, such as welding ship railings and repairing hatches. Mr. Rabito also testified that during his time working as a stevedore, he worked on ships at the same time as the employees of ship repair companies, whose work was not segregated. He said that when a ship came into port, there could be five gangs working on it at the same time performing loading, unloading and repair operations simultaneously, which situation Mr. Rabito described as being "like ants in an ant pile," saying that the workers "would run into each other."
The ship repair companies presented evidence to refute plaintiffs' fact witnesses, which evidence included a corporate representative of each defendant: Thomas Kronenberger, for Dixie; John Lamarque, for B.K.; and Fred Schuber, III, for Eagle. At the time of his testimony, Mr. Kronenberger had been employed by Dixie, a ship repair company, since 1976 and as part of his job had investigated the use of asbestos insulation by Dixie prior to 1976. The crux of Mr. Kronenberger's testimony was that Dixie did not perform any work involving asbestos insulation, because all such work was done by insulation subcontractors procured either by Dixie or by the ship personnel.
Mr. Lamarque, who was eighty-one years old at the time he testified, was still actively employed by ship repair company B.K. as a ship superintendent, having begun his career more than fifty years before working for a predecessor of B.K. Mr. Lamarque testified that B.K. did not employ insulators, and that the majority of insulation work was contracted out to insulation companies. He also stated that all major ship repairs were done at repair wharves, as opposed to the wharves where plaintiffs worked. When a ship's cargo was being loaded and/or unloaded, the only repairs that could be conducted were those inside the ship, such as in the engine room. On-deck repairs, which usually involved steel work such as welding, could not be conducted in the same area where cargo was being loaded or unloaded; cargo operations had priority. Work inside the ship by B.K. employees occasionally involved removal of a small amount of insulation, such as from a valve that had to be sent to the shop to be repaired, but often the ship's crew had already removed this insulation. On-deck work did not involve insulation. According to Mr. Lamarque, in order to repair the older steam-powered winches, the steam had to be shut off and consequently the cargo boom could not be *185 used to handle cargo while the winch repair was being conducted. Finally, Mr. Lamarque testified that vessel railings were insulated exclusively with wood.
Mr. Schuber, the corporate representative for Eagle, testified that Eagle was one of several insulation companies that performed contract work on the New Orleans riverfront at the time in question. He testified that ninety-eight percent of Eagle's work was done at repair wharves, as opposed to wharves where cargo was handled. Moreover, the work not done at repair wharves occurred almost exclusively inside the engine rooms of ships, which rooms were segregated from the cargo holds by watertight bulkheads. Finally, Mr. Schuber testified that Eagle employees only applied new insulation; the old insulation was removed by members of the ship's crew prior to Eagle's arrival.
The threshold issue in the determination of whether the activities of the three ship repair company defendants resulted in "substantial" asbestos exposure to the plaintiffs (that is, exposure of a degree sufficient to constitute a substantial contributing factor in bringing about the plaintiffs' respective diseases) is whether plaintiffs proved the existence of any exposure to Mr. Palermo or Mr. Veal resulting from defendants' activities. In the instant case, that question can be answered by reviewing the factual evidence alone, without considering the expert testimony presented by plaintiffs in their attempt to show such exposure was "substantial."
For instance, none of plaintiffs' fact witnesses recalled Eagle as being one of the repair companies doing work in the proximity of longshoremen. Indeed, none of the plaintiffs' witnesses testified concerning the work of insulation contractors in general. The only evidence concerning Eagle's work was given by the Eagle representative, Mr. Schuber. His testimony that Eagle virtually never performed insulation work in the vicinity of cargo operations was neither contradicted nor rebutted. Therefore, the evidence does not support a finding that plaintiffs experienced any asbestos exposure by virtue of their proximity to Eagle's activities, much less "substantial exposure." Considering the absence of any evidence showing causation, we must conclude that the trial court committed manifest error by finding Eagle liable for negligence which substantially contributed to the plaintiffs' injuries.
Turning to the testimony concerning exposure to the plaintiffs by Dixie and/or B.K., we find very little specific evidence of exposure. At best, plaintiffs' witnesses collectively established that any stevedore or cooper working on the New Orleans wharves during the time period in question inevitably would have been in the general vicinity of ship repair operations performed by these defendants on some occasions. Even ignoring the testimony of the Dixie and B.K. representatives, the testimony of the plaintiffs' own witnesses supports the conclusion that very little, if any, insulation work (the type of work that could possibly generate asbestos fibers) was performed by these defendants in areas where stevedores or coopers might have been, such as in the cargo holds or on the deck of vessels. There is no specific evidence of any single incident where such work was performed by either of these defendants in close proximity to any stevedores or coopers, much less to these particular defendants. The most specific testimony on this issue was Mr. Waguespack's statement that he once observed Mr. Palermo working fifteen to forty feet from some insulation material that had been left on the dock by an unidentified source, which Mr. Waguespack assumed was a ship repair company employee because of a truck parked nearby; he *186 did not see the insulation placed there nor could he recall the company's name on the truck. Moreover, there was no evidence that this insulation material had been worked upon or disturbed in the vicinity of Mr. Palermo.
In Vodanovich, supra, we affirmed the trial court's granting of summary judgment in favor of these same two ship repair companies, Dixie and B.K., in a wrongful death action with circumstances similar to those in the instant case. In that case, the plaintiff, Mr. Vodanovich, was a longshoreman, who, like the plaintiffs herein, had worked most of his life (from 1948 until 1986) performing cargo operations on the New Orleans wharves and had thus been substantially exposed to asbestos as a result of his occupation. After he contracted malignant mesothelioma, Mr. Vodanovich filed suit alleging that various ship repair companies, including Dixie and B.K., had performed repair work aboard the same ships where he was loading and unloading cargo, and that asbestos exposure from this repair work was a substantial factor contributing to his disease. Evaluating the evidence in support of the motion for summary judgment, this court noted that the plaintiff "could not identify the contractors performing this work nor could he provide specific details of the defendants' activities in relation to the work performed and asbestos exposure." Moreover, we noted that the sole other witness, plaintiff's co-worker Mr. Lindsay, "could provide no evidence of specific instances where the defendants' activities caused the plaintiff to be exposed to any asbestos fibers." 03-1079, p. 5, 869 So.2d at 933. This court therefore concluded:
Because the plaintiff has provided no identification of actual work being performed in proximity, there can be no inference that the defendants' activities were a substantial factor in causing plaintiff's injuries.
03-1079, p. 6, 869 So.2d at 934.
In the instant case, the plaintiffs' evidence failed to show that either Mr. Palermo or Mr. Veal experienced any specific instances of exposure to asbestos resulting from the work of Dixie or B.K. Considering the dearth of evidence in this regard, especially in light of the unequivocal evidence showing plaintiffs suffered substantial asbestos exposure by virtue of their lifelong employment as longshoremen during the time period in question, we find that there is no basis in this record to support the trial court's conclusion that the negligence of these defendants was a substantial factor in causing plaintiffs' injuries. We therefore conclude that the trial court committed manifest error by finding these defendants liable to the plaintiffs.
In light of our conclusion that the trial court's finding of liability on the part of all four defendants is manifestly erroneous, we pretermit consideration of all other issues raised by appellants herein.

CONCLUSION
Accordingly, for the reasons stated, the judgment of the trial court is reversed.
REVERSED.
TOBIAS, J., concurs and assigns reasons.
TOBIAS, J., concurs and assigns reasons.
I respectfully concur in the majority's opinion to reverse the judgment of the trial court. I find that under the facts of the case at bar and current Louisiana jurisprudence the defendants lacked a duty to these plaintiffs respecting their exposure to asbestos. We are required to reverse the decision in the plaintiffs' favor.
*187 I respectfully disagree from the majority's reliance on Zimko v. American Cyanamid, 03-0658 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, because that case is not yet final and definitive; an application for a writ of certiorari is pending before the Louisiana Supreme Court.
One must clearly understand the factual and legal basis upon which Zimko was premised and its history.
Zimko was a 3 to 2 decision of this court. American Cyanamid was found liable to the plaintiff and Tate & Lyle was found not liable to the plaintiff. Neither American Cyanamid nor Tate & Lyle sought supervisory review from the Louisiana Supreme Court, but the plaintiff did on the issue of the liability of Tate & Lyle. By implication, American Cyanamid has settled with the plaintiff or agreed not to pursue their appeal further. Thus, the Supreme Court is not reviewing the issue of the correctness of the majority opinion respecting American Cyanamid's liability. (See Judge Kirby's dissent in Zimko, 905 So.2d at 494-98, respecting American Cyanamid's liability.) Any person citing Zimko in the future should be wary of the problems of the majority's opinion in Zimko in view of the Louisiana Supreme Court never being requested to review the correctness of the liability of American Cyanamid.
Recently, the Court of Appeals of New York (that state's highest court) briefly alluded to the problem of Zimko in the case of In re New York City Asbestos Litigation, 5 N.Y.3rd 486, 495-96, 840 N.E.2d 115, 806 N.Y.S.2d 146, 151-52 (2005), and chose not to follow Zimko.

ORDER
Considering the application for rehearing filed by Plaintiffs/Appellees and being of the opinion that good cause is shown for granting rehearing, it is ordered that the above entitled and numbered consolidated cases be fixed for oral argument on Thursday June 1, 2006, at 1:00 p.m.
NOTES
[1] On October 6, 2003, the trial court granted the Motion to Transfer and Consolidate these two cases. This court denied the writ application challenging that decision on November 25, 2003.
[2] The record reflects that the plaintiffs settled with and released the following defendants: (1) Johns-Manville; (2) Cooper / T. Smith Stevedoring Company, Inc.; (3) Ryan Walsh, Inc.; (4) Flintkote Company; (5) Flintkote Mines, Ltd.; (6) Asbestos Corporation, Ltd.; and (7) Owens-Illinois, Inc.
[3] Reilly-Benton Company, Inc. was also a defendant at trial. The trial court's judgment absolved Reilly-Benton of liability and dismissed the plaintiffs' claims against it; the plaintiffs have not appealed that ruling.
[4] The trial court noted in its Reasons for Judgment that only the Palermo plaintiffs had an action against Buck Kreihs.
[5] See footnote 2, supra.
[6] The Dock Board's appellant brief sets forth eight assignments of error and adopts the assignments asserted by the other appellants. The appellant brief filed jointly by B.K., Dixie and Eagle asserts fourteen assignments of error.
[7] These include the admission of the video testimony of Frank Beesom as part of plaintiffs' rebuttal, the exclusion of the testimony of defendant's expert Dr. Jones in the Palermo action, and the admission of certain depositions taken in other cases against defendants that were not parties to those cases.
[8] It was established at trial that Jake Palermo had smoked a pack per day of filtered cigarettes from approximately 1948 until he quit in 1983.
[9] See footnote 2 supra. There remains a dispute among the parties as to how many virile shares are represented by one particular released defendant, Cooper / T. Smith Stevedoring Company, Inc., which was formed by the merger of several named entities that employed the respective plaintiffs at various relevant times. Resolution of this dispute is not necessary in view of our ultimate disposition of this case.
[10] Issues relating to the determination of the exact number of corporate entities with whom each plaintiff settled are addressed in the concluding section of this opinion, infra.
[11] The trial court did not find the Dock Board strictly liable, nor did it address the issue of strict liability in its reasons for judgment. The plaintiffs contend that strict liability was proven at trial.
[12] See La. R.S. 9:2708, which provides that liability shall not be imposed upon public entities based upon their performance of or failure to perform policy making or discretionary acts.
[13] Although plaintiffs do not specifically argue this point, we must consider every possible source in the law upon which a duty of the Dock Board to the plaintiffs might be based.
[14] Because the trial court did not find the Dock Board strictly liable, the Dock Board argues that for this court to do so would require a modification of the judgment in favor of the plaintiffs, which is improper in view of the plaintiffs' failure to answer the appeal or appeal in their own right. Nevertheless, we address this issue for the sake of completeness.