# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 12-1270

**MARKUS TRAUTMANN, ET UX.**

**VERSUS**

**CHARLES G. FITZGERALD, ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20115725
HONORABLE DURWOOD W. CONQUE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John D. Saunders, and Jimmie C. Peters, Judges.

**REVERSED AND REMANDED.**

**Patrick J. Briney**
**Briney & Foret**
**P. O. Box 51367**
**Lafayette, LA 70505-1367**
**(337) 237-4070**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Charles G. Fitzgerald and Jeanne Fitzgerald**

**Steven C. Lanza**
**Onebane Law Firm**
**P. O. Box 3507**
**Lafayette, LA 70502-3507**
**(337) 237-2660**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **Charles G. Fitzgerald and Jeanne Fitzgerald**

**J. Clemille Simon**
**P. O. Box 52242**
**Lafayette, LA 70505**
**(337) 232-2000**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
     **Markus Trautmann and Kelly Trautmann**

**Kevin R. Duck**
**Duck Law Firm**
**5040 Ambassador Cafferry, Suite 200**
**Lafayette, LA 70508**
**(337) 406-1144**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
     **Markus Trautmann and Kelly Trautmann**

**PETERS, J.**

The plaintiffs, Markus and Kelly Trautmann, appeal from the trial court judgment granting summary judgment dismissing their claims against the defendants, Charles G. Fitzgerald and his wife, Jeanne Fitzgerald; and their liability insurer, USAA Casualty Insurance Company (USAA). For the following reasons, we reverse the trial court judgment and remand for further proceedings.

### DISCUSSION OF THE RECORD

In 2010, the Fitzgeralds purchased property in Lafayette, Louisiana, located at 208 Acacia Lane. The house located on the property had been vacant for at least seven years and was in a state of disrepair; and their initial intent was to demolish and replace the structure. However, after considering the results of an inspection by Lawrence Pellerin, a licensed home inspector, and the recommendations of Mark Owen Pritchard, a home designer, the couple decided to repair and renovate the existing structure.

After Mr. Pritchard prepared plans and specifications for the renovation project, the Fitzgeralds sought bids for the work to be performed from a number of contractors, including Markus Trautmann. Mr. Trautmann met on site with the Fitzgeralds on December 12, 2011, and obtained a copy of the renovation plans, but not the inspection report prepared by Mr. Pellerin. Seven days later, on December 19, 2011, he returned to examine the structure and obtain the information he needed to prepare his bid. As he peered over the balcony railing on the second story porch, the railing gave way, and Mr. Trautmann fell to the ground. The fall caused him serious personal injuries.

In their suit against the Fitzgeralds and USAA, the Trautmanns sought damages based on the theories of negligence and strict liability. The defendants answered the claims, asserting that they were not liable to the Trautmanns for the

damages sustained because the condition of the house was obvious and Mr. Trautmann's own negligence was the legal cause of his injuries. Thereafter, the defendants moved for summary judgment on the issue of liability, and, following a hearing on the motion, the trial court granted judgment in their favor dismissing the Trautmanns' claims. The Trautmanns timely perfected this appeal, asserting four assignments of error.

1. The Trial Court committed manifest error and abused its discretion by erroneously applying a "repairman" exception to the strict liability standard applicable in this case.

2. The Trial Court committed manifest error by granting summary judgment where material facts were at issue and the defendant was not entitled to judgment as a matter of law.

3. The Trial Court committed manifest error by finding that Markus Trautmann was a "repairman" at the time of the accident.

4. The Trial Court committed manifest error by granting summary judgment and dismissing plaintiff's entire case where the plaintiff plead facts supporting a claim for negligence and the record supports plaintiff's negligence cause of action.

**OPINION**

The law applicable to a situation where damage is caused by a defective thing is found in La.Civ.Code art. 2317.1, which reads as follows:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

When the defective thing causing the damage is a building, La.Civ.Code art. 2322 applies. That article provides:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

In *Meaux v. Wendy's International, Inc.*, 10-111, pp. 14-15 (La.App. 5 Cir. 10/26/10), 51 So.3d 778, 788, *writ granted on other reasons*, 10-2613 (La. 5/13/11), 69 So.3d 412, the court explained the difference between the prior strict liability law and that currently existing:

> La. C.C. arts. 2317 and 2317.1 define the basis for delictual liability for defective things. La. C.C. art. 2322 defines the basis for delictual liability for buildings. Prior to 1996, an owner's liability for a vice or defect on the premises was rooted in La.C.C. arts. 2317 and 2322. *See, e.g., Celestine v. Union Oil Co. of California*, 98-1868 (La.4/10/95), 652 So.2d 1299. Both La.C.C. art. 2317 and art. 2322 formerly imposed strict liability based upon status as owner or custodian rather than on personal fault. *Id.* at 1303. In 1996, the Louisiana legislature adopted La. C.C. art. 2317.1 and significantly amended La. C.C. art. 2322.

With regard to the issue now before us, the supreme court, in the recent case of *Schultz v. Guoth*, 10-343, pp. 5-7 (La. 1/19/11), 57 So.3d 1002, 1005-06 (alteration in the original), thoroughly reviewed the state of the summary judgment law which would have been in effect at the time of this accident:[1]

> A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. *Samaha v. Rau*, 07-1726, pp. 3-4 (La.2/26/08), 977 So.2d 880, 882-83; *Duncan v. U.S.A.A. Ins. Co.*, 06-363, p. 3 (La.11/29/06), 950 So.2d 544, 546, *see* La.Code Civ. Proc.

---

[1] The Louisiana Legislature recently substantively amended the summary judgment law in 2012 La. Acts No. 257, § 1 and 2012 La. Acts 741 § 1. However, those amendments do not affect the analysis of this matter.

3

art. 966. "A summary judgment is reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; i.e. whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law." *Samaha v. Rau*, 07-1726, pp. 3-4, 977 So.2d at 882-83.

A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ. Proc. art. 966(B). This article provides that "the summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action . . . . The procedure is favored and shall be construed to accomplish these ends." La.Code Civ. Proc. art. 966(A)(2). La.Code Civ. Proc. art. 966(C)(2) sets forth the burden of proof in summary judgment proceedings, providing:

> The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

This provision initially places the burden of producing evidence at the hearing on the motion for summary judgment on the mover, who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case. *Samaha v. Rau*, 07-1726, p. 4, 977 So.2d at 883. "At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial . . . . Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion." *Id.* (quoting *Wright v. Louisiana Power & Light*, 06-1181, p. 16 (La.3/9/07), 951 So.2d 1058, 1069-70).

4

### *Summary Judgment Evidence Presented by the Defendants*

In support of their motion for summary judgment, the Fitzgeralds offered their individual affidavits, the affidavits of Patrick S. Ottinger and Mr. Pritchard, and Mr. Pellerin's home inspection report.

### *Mr. Fitzgerald's Affidavit*

The content of this affidavit asserts that Mr. Fitzgerald and his wife used Mr. Pellerin's inspection report to solicit bids for the project and that they relied on Mr. Trautmann to obtain the information he needed to prepare his bid. He noted in the affidavit that Mr. Pellerin's inspection report noted the presence of live termites on the balcony's wood columns as well as spacing problems with the balcony guardrails. He confirmed that on the day of the accident, Mr. Trautmann was seeking information to help him in the bid process and was not performing any repair or renovation work on the structure.

### *Mrs. Fitzgerald's Affidavit*

Mrs. Fitzgerald added to her husband's affidavit by asserting that she offered a copy of Mr. Pellerin's inspection report to Mr. Trautmann at the December 12, 2011 meeting, but that he refused her offer. She attached a number of photographs taken by her shortly after the accident to her affidavit. It is not disputed that these accurately reflected the condition of certain parts of the premises at the time of Mr. Trautmann's accident.

### *Mr. Ottinger's Affidavit*

Mr. Ottinger owned the limited liability company that sold the 208 Acacia Drive property to the Fitzgeralds. He asserted in his affidavit that the house had been vacant and abandoned for approximately seven years before the transfer and that the state of disrepair was obvious upon inspection and presented a hazard to

anyone who might visit. In fact, when he purchased the property through his limited liability company, he had initially contemplated demolishing the structure down to the foundation, and he even obtained a $11,275.00 offer to accomplish that end.

### Mr. Pritchard's Affidavit

In his affidavit, Mr. Pritchard stated that he was retained by the Fitzgeralds to completely redesign the house. To that end, he prepared plans and specifications which included the removal and replacement of the front balcony and handrails.

### Mr. Pellerin's Home Inspection Report

In the section pertaining to decks, balconies, stoops, steps, areaways, porches, patio/cover and applicable railings, Mr. Pellerin's report states:

> Some deterioration and rot damage observed at the porch and upstairs area wood columns and balcony plywood floor areas, indicating water penetration and what appears to be damage as a result of wood destroying insects. Water had been able to penetrate from the upstairs balcony through seams in the wood boards that were not fully sealed/caulked. I did see live termites in one of the wood columns installed at the driveway side of the back porch area, in the presence of Ms. Fitzgerald. I did see some uniform holes located in the top of some of the upstairs wood columns, perhaps to allow a pest control company to treat for termites. My personal opinion would be to replace all wood columns with matching columns, and with fiberglass as a preventative measure against water issues. *As far as the deterioration and rot damage observed in the upstairs balcony floor areas, this is limited to areas where the columns are installed* with all of the 2x6 wood boards being exposed on the bottom of the balconies, which is a plus. The back side balcony corner are [sic] has a sag of about two inches, due to some deterioration and rot damage. Many of the porch floor tiles are loose and detaching or not secured very well to the concrete foundation slab therefore, I would recommend totally removing the tiles. *Last, I am concerned about the spacing between the guardrail wood spindles, being that a small child or pet could slip through and fall to the ground.*

(Parenthetical information omitted.) (Emphasis added.)

In the comments to this section, Mr. Pellerin entered the notation: "Inspected, Repair or Replace."

Mr. Pellerin's report further states that with regard to the house's exterior:

> Paint flaking throughout the exterior side of the home, located on the wood trim and wood lap siding, which could be the result of an improper paint job or possibly lead. One issue that I can see was occurring although it is not occurring presently, is that vines were allowed to grow up against the home, which can allow the vines to grow into the walls and attic areas, and can lead to the issue with moisture and deterioration.

### *Summary Judgment Evidence Presented by the Plaintiffs*

In their opposition to the motion, the Trautmanns provided the trial court with copies of their deposition testimony as well as the deposition testimony of the Fitzgeralds; Mr. Pellerin; Mr. Pritchard; and Mr. Trautmann's carpenter, Mickey Fontenot.

### *Deposition Testimony of Mr. Trautmann*

Mr. Trautmann, who is originally from Germany, testified that he received an engineering degree in architecture from Hohere Technische Lehranstalt, an Austrian university. However, he never acquired the honorific of architect because he did not complete the required three years of work in that field after graduating. He received his Louisiana residential and commercial contractor's license in 1999, and thereafter began a design/construction business in Lafayette, Louisiana

According to Mr. Trautmann, he only met with the Fitzgeralds for approximately one hour on January 12, 2011. At that time, he obtained a copy of the redesign plans to be used in calculating his bid. Mr. Trautmann disputed Mrs. Fitzgerald's assertion that at this meeting, she offered him a copy of the inspection report. He also acknowledged, however, that he did not request a copy. During that visit, he did observe some termite damage in a back porch column.

7

He returned to the site at approximately 9:00 a.m. on January 19, 2011, and performed a walk-through to determine if the house, as a whole, could be successfully renovated pursuant to the redesign plans. Being satisfied that the job could be accomplished within the parameters of the plans and specifications, he began inspecting the premises more closely to obtain the information he would need to prepare his bid. After approximately ninety minutes, he and Mickey Fontenot went out onto the front balcony to look at the floor. When he walked to the left railing and looked down to determine the nature of the finish on the wall below the balcony, he placed his left hand on the wall and his right hand on the top of the railing. He denied leaning over the railing or allowing any part of his body, other than his right hand, to touch the railing. As he stood there, the railing gave way and he fell to the ground below. When it collapsed, he felt little or no resistance and did not recall the railing making any sound as it gave way. He acknowledged that prior to his fall, he did not attempt to check the railing's stability.

When questioned concerning his observations prior to his fall, he asserted that he did not notice a significant amount of rot, termite damage, or decay in the balcony and posts. He did notice that the railings were painted, but that they also had vegetation growing on them. He equated the vegetation to the area's humid climate rather than the intrusion of moisture into the wood. He was aware that the house had been unoccupied for several years, and he observed that certain parts of the house were in a deteriorated condition. Additionally, based on his evaluation of Mr. Pritchard's proposed renovation plans, he was aware that the balcony and railings were to be removed and rebuilt. He also acknowledged that the

photographs taken by Mrs. Fitzgerald depicted wood rot, termite damage, possible moisture intrusion, peeling paint, and vegetative growth on the railings.

Mr. Trautmann acknowledged that based on his background and training, he was in a better position to determine whether the railing was safe than were the Fitzgeralds. However, he stated that the best person to make this determination was Mr. Pellerin, because, as a house inspector, it was his job to evaluate the integrity of every system in a house in order to discover what can be repaired versus what must be replaced. Had he been provided with a copy of Mr. Pellerin's report with the "Repair or Replace" notation with regard to the railings, he would have been more cautious in his approach to the railings—even to the extent of inspecting them himself. He explained that such a notation in an inspection report is an indication to a contractor, such as he, that the item's current condition is not fit for its intended purpose. Absent knowledge of that notation's inclusion in the inspection report, he did not find that the porch and railings appeared to be obviously and openly dangerous. That is to say, he found nothing to suggest that the situation was unsafe for him to perform his inspection. Although he was aware from Mr. Pritchard's plans that the balcony and railings were to be rebuilt and replaced, nothing in those plans gave him cause to believe that they were being replaced because they were unsafe.

### Deposition Testimony of Mrs. Trautmann

Mrs. Trautmann's deposition presented little direct information concerning the particulars of the accident itself. She learned of the accident through a telephone call from Mickey Fontenot and later was informed that the finishing nails used to construct the railing had rusted through. She described a finishing

nail as one which would not be apparent to a visual inspection because it has no head and is driven below the wood's surface and the entrance hole is puttied over.

### *Deposition Testimony of Mrs. Fitzgerald*

Mrs. Fitzgerald testified in her deposition that neither she nor her husband had any experience in constructing or renovating a structure. She testified that she personally toured the house at 208 Acacia Lane in the company of Mr. and Mrs. Ottinger before she and her husband purchased it. However, during that tour she did not go onto the balcony because she was not sure it was safe. After Mr. Pellerin completed his inspection, she again walked throughout the house, including the balcony. After that experience, she felt fairly safe in walking on the balcony. Later, she accompanied Mr. Pritchard when he made his inspection of the house, but did not go onto the balcony on this occasion.

According to Mrs. Fitzgerald, at no time did the Ottingers, Mr. Pellerin, or Mr. Pritchard state to her that the balcony was unsafe. At most, Mr. Pellerin based his recommendation that the posts and railings be replaced because they were not up to the requirements of the applicable building codes, and they were in bad condition. Additionally, the redesign plans called for deeper porches so the existing roofline and balconies were all being replaced. Still, she suggested that a mere visual inspection made it obvious that the balcony was unsafe. In explaining this comment, Mrs. Fitzgerald stated that everybody in the neighborhood knew the house had been vacant for over five years, windows were boarded up, the front porch columns were rotten at the bottom, porch tiles were popping off, paint was peeling off and chipping, there were wasps, the gutter on the front balcony was hanging down, loose spindles existed on the balcony railing, and moss was growing on the railing.

Mrs. Fitzgerald initially met Mr. Trautmann on January 12, 2011, and her husband later joined them. During that meeting, they did not go onto the balcony. Her testimony supported her assertion in her affidavit that she offered Mr. Trautmann a copy of the inspection report at the same time she gave him the renovation plans, but that he declined her offer. Furthermore, during this meeting her husband warned Mr. Trautmann that the porches were in bad condition.

Mrs. Fitzgerald saw Mr. Trautmann at the house on the morning of January 19, 2011, but left before the accident. She gave him no warning concerning her opinion of the condition of the balcony and railing, but testified that she did not believe the railing was in such bad condition that it would have fallen without some weight being pressed against it. After learning of the accident, she returned to the house and took pictures of the premises, including the railing laying on the ground below the balcony. After the accident, no one was allowed on the balcony.

### Deposition Testimony of Mr. Fitzgerald

Mr. Fitzgerald, who is a lawyer, reasserted his wife's testimony that they have no background in construction work. However, based on his personal observation, the hazard posed by the railings on the balcony was far beyond being simply obvious. He observed vegetative growth protruding out of the wood, paint chips, buckling, dangling spindles, and a partially detached gutter  In fact, he considered the situation of the entire upstairs portion of the house to be so bad that he was afraid that if he and his wife might venture up there, the house might implode.

Despite this fear on his part, on January 12, 2011, when he joined his wife and Mr. Trautmann, they were both already upstairs. According to Mr. Fitzgerald, when Mr. Trautmann mentioned going out onto the balcony, he [Mr. Fitzgerald]

11

commented, "You gotta be kidding me. [Y]ou couldn't pay me to walk out on those balconies." He suggested that his response was not based on the findings of the inspection report, but on common sense as the balcony looked "very, very unsafe." He felt that Mr. Trautmann's reaction was dismissive of his comments, but he [Mr. Trautmann] did not go out onto the porch that day. Although he acknowledged glancing through Mr. Pellerin's inspection report, Mr. Fitzgerald testified that he did not have to read the report to know that the balcony railings should be replaced.

***Deposition Testimony of Mickey Fontenot***

Mr. Fontenot testified that he and Mr. Trautmann went out onto the Balcony to examine the flooring for damage and, while they were there, he questioned Mr. Trautmann concerning the nature of the siding on the front of the house. Instead of walking downstairs to examine the siding, he, Mr. Fontenot, walked over to the right railing, and Mr. Trautmann walked to the left. As he looked at the wall below him, Mr. Fontenot heard a noise. When he turned around in response to the noise, he saw only Mr. Trautmann's feet as he fell from the balcony. When he approached the area where Mr. Trautmann had fallen from, he observed Mr. Trautmann lying on the ground below, and he noticed that the railing through which Mr. Trautmann had fallen was lying next to him, still in one piece.

Mr. Fontenot never saw the inspection report. He testified that had he received a copy, he would have reviewed. Additionally, had he known of Mr. Pellerin's notation in the report, he would have approached the balcony and railings in a more cautious way. He did acknowledge, however, that while on the balcony, he noticed that part of the railing was discolored, peeling paint, and missing balusters. He noted that the yellowish discoloration at the bottom of

several balusters, as depicted on one of the photographs, was caused by compromised paint which allowed moisture to penetrate the wood and rust the nails. Additionally, the photographs revealed moss or mildew growing on the bottom rail of the railing which gave way. Given his findings from these photographs, he stated that it would have been wise not to lean on the railing without first determining if it were secure. However, he stated that neither picture revealed that the wood was rotten.

### *Deposition Testimony of Mr. Pellerin*

Mr. Pellerin is a licensed home inspector with ten years of experience as an inspector, but with thirty years of experience in maintenance and repair. He testified that he performed his inspection on August 26, 2010, and in doing so, visually inspected every system of the house. He agreed with Mr. Trautmann's observation that a notation in the inspection report that a system should be repaired or replaced means that something is wrong with the item or that it should be looked at further.

As a part of his overall obligations, Mr. Pellerin went onto the balcony and inspected the railing, which he described as a component of the balcony. He did not recall the particulars of this inspection, but testified that he would typically begin by checking for movement in the railing. Additionally, if he suspected the intrusion of water, he also would have probed the wood. His report stated that he observed some deterioration and rot in the porch, upstairs area, wood columns, and balcony plywood floor, as well as a two-inch sag in the back side of the balcony due to deterioration or rot damage. However, he denied that the entire balcony was damaged by rot. Mr. Pellerin testified that he saw live termites in a column on the back porch and dirt tracts or trails in other areas. In describing the house, Mr.

Pellerin stated that it was obviously a "fixer-upper" and that it had been vacant for a long time based on the amount of neglect and deterioration evidenced.

***Deposition Testimony of Mr. Pritchard***

Mr. Pritchard testified that he received Mr. Pellerin's home inspection report from the Fitzgeralds around the time they started this project. Although he had visited the house prior to being retained by the Fitzgeralds, he stated that he did not test or inspect the railings for sturdiness. Based on the contents of the inspection report and his own observations, Mr. Pritchard determined that the house could be renovated. His first completed set of house plans contemplated the removal of the existing porches and balconies, with them being rebuilt as deepened structures. Not only were the front-balcony handrails to be removed because they did not conform to the current building codes, but the removal was necessitated by the proposed redesign.

Mr. Pritchard testified that after Mr. Trautmann's accident, he observed the railing lying on the ground. Although he did not inspect it closely, he said that it was basically still in one piece. He described the railing as consisting of a top and bottom rail, made from two by four inch boards, which he described as being positioned so that the width of the board was horizontal to the porch. The balusters were constructed from two by two inch boards and were attached to the top and bottom railings by nails which were toenailed or nailed into the railings at an angle. The assembled railings were then attached to the balcony posts by nails which were also toenailed. Mr. Pritchard described the toenailing of the nails into the bottom railing as well as the flat surface nature of the bottom rail, as having the effect of allowing water to accumulate in the nail hole. This accumulation of water in the hole caused the wood to rot and the nail fasteners to rust.

14

Mr. Pritchard stated that Mr. Trautmann's accident merely confirmed his suspicions concerning the defective construction of the railing. His suspicions were further confirmed when the carpenters, who ultimately demolished the balcony, described to him and physically showed him how the balcony was constructed.

After the balcony was demolished, Mr. Pritchard observed that the railings were connected with small gauge nails, which he explained are more prone to rusting and weakening and, unlike screws, can be pulled out under the application of sufficient force. He further indicated that the nails used had smaller heads, so that when force was applied to the railing, rather than the nail pulling out, it stayed in place and the wood slipped over it. This presented more of a problem when the wood was rotten in the area where it was nailed. In that situation, the wood would be even more vulnerable to pulling free. After the accident, he definitely recalled seeing parts of the railing or posts, including connecting areas, that were rotten, but he could not specifically recall where they were located.

Mr. Pritchard voiced the opinion that the railing was poorly constructed based on the fact that there were no visible nails and because the wood was exposed in areas such that some portions were missing, other portions discolored, and other portions had vegetation growing on and around it. Although the presence of the vegetation did not necessarily mean that the wood was rotten, Mr. Pritchard thought that it indicated a lack of maintenance, which would cause him to question its condition. After reviewing photographs taken of the railing, Mr. Pritchard also opined that the railing detached from the wall and the corner post due to three conditions: the condition of the nails, the condition of the railing, and the way the railing was fastened to the wall and the post. In fact, it appeared to

him that the ends of the railing were compromised. He explained that a wooden board generally rots from its most vulnerable areas, which are the ends. Mr. Pritchard identified evidence of rust on the nails which were still attached to the railing, and he stated that the appearance of the nails indicated that they were pulled out of the balusters because they were unable to hold their place.

Not only did Mr. Pritchard conclude that the railings were substandard, but he found that the posts and the floor of the balcony were also very deteriorated. He testified that even if the design plans had not called for a redesign and extension of the porches, he would have recommended the replacement of the balcony railings, posts, and floor.

Mr. Pritchard further opined that the railing would not have failed absent the application of a weight or force. He stated that the failure of the railing from someone applying more than one-half of their weight to it, would not surprise him. He further agreed that the construction of the railing system on the balcony was substandard. Moreover, he stated that the poor condition of the house was obvious. Mr. Pritchard testified that the deterioration of certain elements of the house were obvious and that those obvious deteriorations led him to suspect other less obvious elements.

### *Action of the Trial Court*

The trial court granted summary judgment in favor of the Fitzgeralds, based on its interpretation of the supreme court's opinion in *Celestine v. Union Oil Co. of California*, 94-1868 (La. 4/10/95), 652 So.2d 1299. Basically, the trial court concluded that the *Celestine* decision and the legislature's subsequent amendment of the strict liability articles of the Louisiana Civil Code established a rule of law prohibiting a repairman from recovering damages for a strict liability claim arising

16

under La.Civ.Code arts. 2317.1 and 2322. In issuing its ruling, the trial court stated that with regard to repairmen, "It simply does not apply to them." In addressing Mr. Trautmann's claim, the trial court concluded that the *Celestine* decision would extend the repairman prohibition to those who go onto property for the purpose of preparing a bid to obtain a contract of repair.

### *Analysis*

We find that the trial court erred in its interpretation of the *Celestine* decision. Rather than exclude any strict liability claim that might be asserted by a repairman, the supreme court recognized that a repairman could exert such a claim, but that his status as a repairman would be a significant factor to be considered in determining whether the risk posed by the defect of the thing or the building was unreasonable. Specifically, the supreme court stated:

> We therefore conclude that an owner is strictly liable to a repairman for injury caused by a vice, defect or ruin on his premises only where the building or defect therein poses an unreasonable risk of harm vis-a-vis the repairman. Given that the determination of whether a risk is "unreasonable" is context specific, the fact that an injured party was a repairman hired to fix the defect is a relevant factor in assessing whether the defect posed an unreasonable risk of harm.

*Id.* at 1305.

In exploring what might be considered an unreasonable risk of harm, the supreme court stated:

> Thus, the determination of whether a particular risk of harm is reasonable is a matter wed to the facts of the case. Perhaps except only in ultrahazardous cases, it is impossible and improper to characterize a risk as unreasonable without consideration of the surrounding circumstances. Thus, any per se rule that an owner may never be held strictly liable to a repairman injured while repairing the alleged defect is unworkable and contrary to the fact intensive nature of the definition of "unreasonable risk." Rather, the individual circumstances, including but not limited to the social, moral, economic considerations, the degree of knowledge of the repairman, the incentive or disincentive to the owner to repair the vice or defect,

17

the reasonableness of presuming that a particular repairman is cognizant of the particular risks, and the ability of the repairmen to minimize such risks, should all be factored into and weighed in the "unreasonable risk" calculation. For example, the extent to which an owner's incentive to repair the premises may be destroyed if held strictly liable to a repairman must be balanced against the repairman's rights under La.C.C. art. 2322 to hold an owner answerable in damages for defects or vices on the premises. To the extent that the Third Circuit may have adopted a per se rule of a "repairman" exception to an owner's strict liability, such a ruling is not correct.

*Id.* at 1304.

Because the trial court erroneously concluded that as a matter of law, Mr. Trautmann could not maintain a strict liability claim against the defendants, it never reached the issue of whether the defendants carried their initial burden of proof by establishing an absence of factual support for one or more essential elements of the Trautmann's claims. *See* La.Code Civ.P. art. 966(C)(2). However, the record before us is complete, and we will review the record de novo. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So.2d 880.

As stated in *Meaux,* 51 So.3d at 788,

[A] plaintiff alleging strict liability of a building owner or custodian must now prove the following elements: (1) that the defendant knew or should have known of the vice or defect; (2) that the damage could have been prevented by the exercise of reasonable care; and (3) that the defendant failed to exercise such reasonable care. *Cochran v. Safeguard Self-Storage, Inc.*, 02-1272 (La.App. 5 Cir. 4/29/03), 845 So.2d 1128, 1130. If the plaintiff fails to prove any one of these elements, the claim fails. *Dauzat v. Thompson Const. Co., Inc.*, 02-989 (La.App. 5 Cir. 1/28/03), 839 So.2d 319. In addition, for strict liability to attach to a building owner or custodian, the "vice" or "defect" must constitute a dangerous condition, which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances. *Monson v. Travelers Property & Cas. Ins. Co.*, 06-921 (La.App. 5 Cir. 4/24/07), 955 So.2d 758; *Loescher v. Parr*, 324 So.2d 441, 446-447 (La.1975).

We note it is also well settled that a landowner will not be held liable for damages cause by an open and obvious hazard. *Eisenhardt v. Snook*, 08-1287 (La. 3/17/19), 8 So.3d 541.

> If the facts of a particular case show that the complained-of condition should be obvious to all, the condition may not be unreasonably dangerous, and the defendant may owe no duty to the plaintiff. The degree to which a danger may be observed by a potential victim is one factor in the determination of whether the condition is unreasonably dangerous. A landowner is not liable for an injury which results from a condition which should have been observed by the individual in the exercise of reasonable care, or which was as obvious to a visitor as it was to the landowner. *Dauzat v. Curnest Guillot Logging, Inc.*, 08-0528 (La.12/2/08), 995 So.2d 1184; *Hutchinson v. Knights of Columbus*, 03-1533 at p. 9 (La.2/20/04), 866 So.2d 228, 234; *Pitre v. Louisiana Tech University*, 95-1466, 95-1487 at p. 11 (La.5/10/96), 673 So.2d 585, 591. It is the court's obligation to decide which risks are unreasonable based upon the facts and circumstances of each case. *Harris v. Pizza Hut of Louisiana, Inc.*, 455 So.2d 1364, 1371 (La.1984).

*Id.* at 544-45.

In reviewing the evidence submitted in support of their motion, we find that the defendants did carry their burden of proof as required by La.Code Civ.P. art. 966(C)(2). In doing so, the defendants do not argue that no vice or defect exists. Instead, they presented sufficient evidence of an open and obvious hazard sufficient to shift the burden to the Trautmanns to "produce factual support sufficient to establish that [they] will be able to satisfy [their] evidentiary burden of proof at trial." *Id.* Specifically, Mrs. Fitzgerald's affidavit asserted that Mr. Trautmann was offered a copy of the inspection report that would have placed him on notice of the defective nature of the railing. Mr. Fitzgerald's affidavit establishes that had Mr. Trautmann referred to the inspection report, he would have been aware that the balcony's columns were infested with termites. Mr. Ottinger's affidavit established that the house had been vacant for at least seven years before his limited liability company sold it to the Fitzgeralds and that the state of disrepair of the structure was obvious upon inspection and presented a hazard to anyone who might visit. Finally, Mr. Pellerin's inspection report provided clear evidence that he found evidence of rot damage on the upstairs balcony floor areas where the

19

columns were installed and that the spacing between the guardrail's wood spindles was dangerous to small children. His report further established that the exterior of the house was in an obvious state of disrepair.

The Trautmanns' burden was then to counter the defendants' offerings with evidence sufficient to establish genuine issues of material fact. With regard to the first element of proof concerning the Fitzgeralds' knowledge of the vice or defect, the deposition testimony of both Mr. and Mrs. Fitzgerald reveals that they had concerns with regard to the safety of the upstairs section of the house and, particularly, the upstairs balconies.

The deposition testimony of Mrs. Fitzgerald and Mr. Trautmann establish a conflict concerning whether Mrs. Fitzgerald offered Mr. Trautmann a copy of the inspection report at the initial meeting on January 12, 2011. According to Mr. Trautmann, access to that report was very important given the "Repair or Replace" notation entered into that report by Mr. Pellerin. Mr. Trautmann testified that a contractor would recognize this notation as a finding by the inspector that the item's current condition was not sufficient for its intended purpose, and he would have exercised greater care. The deposition testimony of Mr. Pellerin supports this interpretation of such a notation.

Finally, concerning the open and obvious nature of the defect, there is no dispute but that the house was in a state of significant disrepair. However, that fact in itself does not render the defect in the railing an open and obvious defect. With the deposition testimony offered in opposition to the motion for summary judgment, the Trautmanns present conflicting views concerning the specific nature of the defect.

While concluding through her personal observations, that the balcony and its railings were an open and obvious hazard, Mrs. Fitzgerald also testified that no one ever told her that the balcony was unsafe. She understood that it was to be replaced because it did not meet the requirements of the existing building codes and the redesign plans called for deeper porches. Additionally, although Mr. Fitzgerald testified that he was not willing to take a chance on the integrity of the front balcony, his wife testified that after walking on the balcony with Mr. Pritchard, she felt fairly safe on the balcony. While noticing decay on the balcony, Mr. Fontenot found nothing that would have caused him concern in traversing that part of the structure; and neither Mr. Pellerin nor Mr. Pritchard recalled testing the sturdiness of the railings.

According, to Mr. Pritchard, he found the cause of the accident only after he personally inspected the accident scene and talked to the carpenters who ultimately demolished the balcony and remaining railings. At that point he found that the nails were improperly inserted and he reached the conclusion that the initial construction of the railings was defective.

When considering a motion for summary judgment, we are precluded from weighing the facts and reaching conclusions based on those facts. *Doe v. Hawkins*, 09-1184 (La.App. 3 Cir. 6/9/10), 42 So.3d 1000, *writ denied*, 10-1612 (La. 10/8/10), 46 So.3d 1270. Instead, our review is limited to a determination of whether there are genuine issues of material fact remaining. In this case, we find the existence of genuine issues of material fact which cannot be resolved by a summary judgment proceeding.

## DISPOSITION

For the foregoing reasons, we reverse the trial court judgment granting the motion for summary judgment of the defendants, Charles G. Fitzgerald, Jeanne Fitzgerald, and USAA Casualty Insurance Company, and against the plaintiffs, Markus Trautmann and Kelly Trautmann, dismissing their suit for damages. We remand the matter to the trial court for further proceedings and tax all costs of this appeal to the defendants, Charles G. Fitzgerald, Jeanne Fitzgerald, and USAA Casualty Insurance Company.

**REVERSED AND REMANDED.**